ED CARNES, Chief Judge:
Because it is a document designed to govern imperfect people, the Constitution does not demand perfect trials and errors do not necessarily require the reversal of a conviction. More than thirty years ago, the Supreme Court reminded us: “As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one.” Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). Alexander Roy, who was convicted in federal court of five sex-related crimes involving minors, received a fair trial although not a perfect one.
The error in Roy’s trial occurred when his counsel returned a few minutes late from a lunch break on the third day of the six-day trial. He missed only a small part of the testimony of the 12th of 13 government witnesses. Counsel was out of the courtroom for only seven minutes of a trial that lasted 1,884 minutes or 31.4 hours (not counting recesses and jury deliberations). That is less than one-half of one percent of the trial time. During his absence counsel missed only 18 answers out of a total of approximately 2,745 answers that were given by government witnesses during the trial. That is less than one percent of the total testimony against Roy. And the little testimony that counsel had missed was repeated in even more detail by the same witness after counsel returned to the courtroom.
The parties agree that it was Sixth Amendment error for inculpatory testimony to be taken in the absence of defense counsel. Their primary disagreement is about whether it was a type of structural error for which prejudice is presumed, or trial error to which the harmless error rule applies. They also disagree about whether our review is limited to plain error and about whether the error was actually harmless.
I. The Charged Crimes
Roy was charged in a five-count indictment with sex crimes related to minor girls. Count 1 charged him with attempted child enticement in violation of 18 U.S.C. § 2422(b), based on his efforts to arrange a sexual encounter with someone he believed to be a 13-year-old girl in response to an internet ad posted by law enforcement. That charge did not involve any child pornography. And no questions about *1136 the Count 1 charge were asked during counsel’s brief absence. None.
Counts 2-5 did involve child pornography. Each of those four counts charged Roy with knowingly possessing “any visual depiction” of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), (b)(2) (emphasis added). The difference between those four counts is based on the four different electronic devices Roy used to store his images of child pornography: his desktop computer (Count 2); his laptop computer (Count 3); his USB thumb drive (Count 4); and three of his CD-ROM discs (Count 5). All that the government had to prove under each of Counts 2-5 was that Roy knowingly possessed one or mox;e images of child pornography on the electronic device specified in that count. It could be the same image or images on each device or different images, so long as there was at least one on each device. As we will discuss in more detail in the next part, the evidence proved without dispute that there were multiple still images and video images of child pornography involving a number of different minors on each of Roy’s four electronic devices. Roy had a sexual relationship with one of the minors, and he had produced the pornographic still and video images of that child, some of which were contained on all four devices. Each of the four devices also contained other child pornography, involving different minors, that Roy had downloaded from the internet.
II. The Evidence
For analytical ease we break the testimony and evidence presented during the trial down into three categories: that presented before counsel’s brief absence from the trial, that presented during his absence, and that presented after he returned.
A. Before Counsel’s Absence
During the first two days of Roy’s six-day trial, with defense counsel present at all times, the government called 10 witnesses whose testimony focused on the attempted child enticement charge in Count 1. Their unrefuted testimony showed that Roy, a middle school teacher, set up a sexual encounter that he thought would involve a 13-year-old girl and her mother, and he drove to a pre-arranged location to meet the mother and child so that he could have sex with the child. Their testimony also showed that he went to the illicit rendezvous with condoms and a bottle of Astroglide lubricant in his pockets. Roy’s lawyer was in the courtroom for the entirety of those first two days of trial and for the presentation of all of the testimony and evidence about the crime that was charged in Count 1. He did not miss any of it on any day. On the third day of trial, before the lunch break and in counsel’s presence, there was additional testimony about Count 1, including the fact that Roy had traveled more than an hour to get to the meeting place for the purpose of having sex with a 13-year-old girl.
Much of the testimony on that third morning, however, went to Counts 2-5 and concerned Roy’s sexual relationship with L.B., the girl in the pornographic images and videos that Roy himself had produced and stored, along with child pornography from the internet, on his four electronic devices specified in those four counts. That same morning, with defense counsel present, William Kulp, an agent of the Florida Department of Law Enforcement, testified without objection that L.B. was born on May 9, 1989. That means any pornography of her that was produced before May 9, 2007 is child pornography. See 18 U.S.C. § 2256(1) (defining “minor” for this purpose as anyone under 18 years of age). The principal at the high school L.B. had at *1137 tended identified photos of her in various school yearbooks, three of which were admitted into evidence without objection. The principal’s testimony and those yearbook exhibits enabled the jury to compare how L.B. looked at various ages during her school years with how she looked in the pornography that Roy had produced.
The third and final government witness to be called before the lunch break on the third day was Deputy Sheriff Charlie Longson, a computer forensics expert. In defense counsel’s presence, he testified extensively about his qualifications and how he examines a computer. He also testified about the user and email/messenger accounts that he had found on Roy’s desktop computer. That testimony was used, among other things, to put into evidence Roy’s email messages setting up his sexual liaison with the (fictitious) 13-year-old and the sexually oriented instant messenger conversations between Roy and (the real) L.B. that were on his computer. Longson’s testimony was interrupted by a lunch break.
B. During Counsel’s Absence
Defense counsel returned late from the lunch break on the third day of trial and missed seven minutes of Deputy Longson’s continuing testimony. During the seven minutes counsel was out of the courtroom, Longson gave 18 answers to the AUSA’s questions. A1 of those 18 answers concerned only six of the numerous images of child pornography, and all six of those images were of a single female subject. Those particular images of the young female were found in only one of the several file folders containing child pornography that were on Roy’s desktop computer. That folder, when discovered by Longson on Roy’s desktop computer had been labeled “2006-03-11.” On that date, L.B. indisputably would have been 16 years old.
Longson testified that those six images showed “a nude white female ... bound to a table by her feet with rope” and with “an orange cloth ... secured around her neck with silver duct tape.” He also testified that the six images were taken with a Kodak v530 Zoom Digital Camera on March 10, 2005, were initially uploaded onto a computer on March 11, 2006, and were then transferred to Roy’s desktop computer on April 4, 2009. During the seven minutes while defense counsel was out of the courtroom, no exhibits were admitted into evidence and Longson did not identify L.B. as the female in the six pornographic images.
C. After Counsel Returned
Soon after counsel returned to the courtroom, the testimony that Longson had given during counsel’s brief absence was repeated.[1] And it was only after counsel returned that Longson identified L.B. as the young female in the six images of pornography found on the desktop computer that he had been testifying about.
This is how those events unfolded. After defense counsel entered the courtroom, the prosecutor asked the court for permission to speak with him, which the court granted. There was then a pause in the proceedings, and after the prosecutor and defense counsel had an opportunity to speak, the prosecutor approached witness Longson with 10 exhibits: the six pornographic images of L.B. that Longson had found in the *1138 “2006-03-11” folder on Roy’s desktop computer; three other pornographic images of L.B. from a different folder on that computer, which was titled “2006-12-04”;[2] and a “contact sheet” generated by the camera showing still images from a pornographic video of L.B., also recovered from that second folder. See also infra n.3.
With counsel present Longson then described in detail what each of those images depicted, and he also testified that the six images from the “2006-03-11” folder had been created on March 11, 2006, and uploaded onto Roy’s desktop computer (which Roy had acquired later) on April 4, 2009. Those six images showed the then-16-year-old L.B. “bound to a table by her feet with a ... red and white ski rope”; she was wearing an “orange hood across her head with silver duct tape secured around the neck”; there was a “dildo inserted in her vagina” and “a male’s penis ... suspended above [her] body.” During that and all the other testimony that would follow counsel was there.
He was present when Longson first described the other three pornographic images of L.B. found on Roy’s desktop computer in the “2006-12-04” folder. Those images showed L.B. lying naked in a bathtub, and written in “black ink both on [her] chest between the breasts and then on [her] stomach over the nav[e]l” were the words “Alex’s Little Cunt.” (Roy’s first name, of course, is Alexander, and his roommate and L.B. both called him “Alex.”) Longson testified that those particular pornographic images were taken on December 2, 2006. On that date, L.B. indisputably would have been only 17 years old, which means she was a minor for purposes of the child pornography charges against Roy in Counts 2-5.
At that point in the trial, Deputy Long-son described for the first time the contact sheet taken from the “2006-12-04” folder showing nine images from the pornographic video of L.B. A few pages later in the transcript, Longson repeated his earlier testimony that all of the images of L.B. on Roy’s desktop had been taken with a Kodak v530 Zoom Digital Camera, which is the model of camera recovered from Roy’s home during the police search.
At the times all of those images of L.B. — the six in the “2006-03-11” folder and the three plus the contact sheet from the “2006-12-04” folder — were created, she was a minor for purposes of the child pornography charges against Roy in Counts 2-5 because she was under 18 years of age. See 18 U.S.C. § 2256(1). The 10 exhibits consisting of those images were admitted into evidence without objection. Being present during all of the testimony we have just recounted, Roy’s trial counsel had an opportunity to object to the testimony or to admission of the exhibits into evidence, if there were any basis for doing so. He did not object to any of it.
In the presence of defense counsel, Longson also testified about finding on Roy’s desktop, laptop, thumb drives, and CD-ROM discs numerous pornographic videos of L.B. that had been made between October and December 2006 using a Kodak v530 Zoom Digital Camera. It was undisputed that L.B. would have been 17 years old, and therefore a minor, during all of that time. Some of those videos showed: L.B. bound and blindfolded with a “body net covering her body” and “a red dildo inserted into her anus”; L.B. “fully nude” *1139 with a “dildo in her vagina” while she “perform[ed] fellatio on a white male”; L.B. “fully nude” with a “vibrator in her vagina” while a white male “attempted] to have annal [sic] sex with her”; L.B. performing fellatio after removing a “schoolgirl outfit”; L.B. having sexual intercourse with a man while she was tied up; and L.B. lying “nude in [a] bathtub” with “Alex’s little cunt” scrawled across her chest and stomach while a man urinated on her. Longson described each of those videos and they were admitted into evidence. Although defense counsel was present during all of that testimony and admission of exhibits, he did not object to any of it.
Deputy Longson’s testimony in defense counsel’s presence about the child pornography that he found on Roy’s desktop, laptop, USB drive, and CD-ROM discs was not limited to all of the images and videos of L.B. He also testified about finding in temporary internet files on Roy’s desktop computer several images of downloaded child pornography involving minors other than L.B., which is a subject that had not been mentioned at all during counsel’s brief absence from the courtroom. With counsel present, Longson described how one of those images of other minors showed “two or three subjects under the age of 18 engaged in sexual activity with two men.” He also described finding on Roy’s laptop a folder labeled “Girls,” which contained pornographic images of other minors and files named “kingpouge_14,” “vical6,” and “svet„16.” Longson testified that he had found five images of child pornography featuring minors other than L.B. on Roy’s USB thumb drive. And he testified that he had found on Roy’s CD-ROM discs multiple pornographic images of minors other than L.B., which were copies of images on Roy’s other devices.
All of those were pornographic images of minors other than L.B., and all of them were admitted into evidence. Although he was present during all of that testimony, defense counsel did not object to any of it. Any one of those pornographic images of minors other than L.B. was enough by itself to prove the crime of possession of child pornography in violation of 18 U.S.C.' § 2252(a)(4)(B), (b)(2), which is the crime charged in Counts 2-5 of the indictment.
Once the prosecution completed its direct examination of Longson, defense counsel cross-examined him over the course of 45 pages of the trial transcript. He attempted to challenge Longson’s testimony that the images and videos of L.B. were created when she was under the age. of 18. His challenge fell short, however, because Longson explained that data embedded in the images and videos of L.B. showed that they had been taken on a date when L.B. was a minor. Defense counsel did not even attempt during cross-examination or at any other time to challenge Longson’s testimony about the pornographic images involving minors other than L.B.
On the fourth day of trial, the government called its last witness and then rested. The defense called a few witnesses, including Robert Deane Moody, its own computer forensics expert. He testified that there were reported problems with the battery life of the Kodak camera model that Roy had used to produce the pornographic images of L.B., which would cause the camera’s internal clock to reset to its default date and time if the camera’s battery went dead. If the internal clock in the camera used to create the images of L.B. had reset, in his opinion it was possible that the creation dates that Deputy Long-son had noted for the L.B. images and videos might be inaccurate.
Moody conceded, however, that the problems he had described were not necessarily present in all Kodak v530 cameras, and he conceded that Roy’s camera might not have had any battery issues anyway. *1140 He admitted that the dates applied by a user to the computer folders in which the L.B. images were stored (i.e., “2006-03-11,” “2006-10-13,” and “2006-12-04”) were all consistent with the creation dates that the camera had automatically embedded in those images themselves. Moody also admitted that the images and videos were numbered sequentially and none of them showed any signs of having reverted back to an earlier date.
III. The Facts Concerning Counsel’s Brief Absence
We know only these facts about counsel’s absence. On the third day of trial during the testimony of Deputy Longson, who was the 12th of 13 government witnesses, the judge announced the lunch break: “Okay. So let’s go ahead and break for lunch and ask you to be back at 1:30.” The jury left the courtroom at 12:33. The next thing in the transcript is this parenthetical notation by the court reporter: “(Court recessed at 12:34 p.m., and proceedings continued, without the presence of defense counsel, at 1:29 p.m.).”
The testimony of Deputy Longson resumed at 1:29 p.m. and continued for two- and-a-half transcript pages, consisting of 18 questions and answers, after which the following occurred:
[AUSA]: Your Honor, may I have a moment while I approach Counsel? (Defense counsel entered the courtroom at 1:36 p.m.)
(Pause.)
[AUSA]: Thank you, Your Honor. May I approach, Your Honor?
The Court: All right.
[AUSA]: I’m showing the witness Government’s Exhibits 73-01 through 73-10.[3]
To recap, after lunch the trial resumed one minute earlier than it had been scheduled to, and defense counsel returned six minutes later than the time he had been instructed to be there. As a result, he missed seven minutes of a trial that lasted a total of 1,884 minutes or 31.4 hours (not counting recesses and jury deliberations), which means he was present during 99.6 percent of the trial. Counsel missed hearing only 18 answers given by one of the 13 government witnesses against him, who collectively gave a total of approximately 2,745 answers. Even if we consider only the testimony of Deputy Longson, the witness who was on the stand when he returned late, counsel missed only three of the 175 pages of Longson’s total testimony (which consisted of 111 pages of direct examination, 45 pages of counsel’s cross-examination, and 19 pages of redirect examination). We know that from the record.
We do not know why counsel returned late from lunch. We also do not know if he realized when he walked in late that some testimony had been taken in his absence, either because he heard testimony being given, or he saw that there was a witness on the stand and the AUSA was up, or because his client who had been present told him what had happened. And we do not know if either the AUSA or the judge realized that defense counsel was absent when the trial resumed after lunch.[4]
*1141 One thing that we do know is that neither party wants us to take the necessary steps to find out any of those facts. Both sides insist that instead of remanding for an evidentiary hearing to determine all of the other facts about counsel’s brief absence, including who knew what and when, we should decide the appeal solely on the basis of the facts that are already in the record.[5] We will.[6]
IV. An Assumption to Simplify the Analysis And Focus on the Harmless Error Issue
The government argues that we should review only for plain error and that there isn’t any. See United States v. Duncan, 400 F.3d 1297, 1301 (11th Cir. 2005) (“We have discretion to correct an error under the plain error standard where (1) an error occurred, (2) the error was plain, (3) the error affected substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.”). Absent any knowledge of why defense counsel was absent, whether the AUSA or judge realized he was not present, about what counsel realized or didn’t when he walked in late, and about whether he took some ameliorative action not reflected in the transcript, we will not apply the plain error rule or remand for any findings necessary to decide if it is applicable. Instead, in order to simplify our analysis, we will indulge the assumption that the plain error rule does not apply even though there was no contemporaneous objection. We can indulge that assumption because even with it the result is the same.
Given that scope of review, we do agree with Roy that absent evidence of an attempt to deliberately inject error into the record and without a waiver from the *1142 defendant, it is a violation of the Sixth Amendment for inculpatory testimony to be taken from a government witness without the presence of at least one of the defendant’s counsel, regardless of whether the judge or the AUSA noticed that counsel was not there. We do not, however, agree with Roy that prejudice is presumed and reversal is automatic. Instead, for the reasons that follow we hold that the harmless error rule is applicable to this brief absence of counsel from the courtroom, and that the absence was harmless beyond a reasonable doubt in this case.
V. Analysis: Why the Harmless Error Rule Applies and the Rare Exceptions to It Do Not
Given our assumptions in Roy’s favor, the outcome turns on whether the error in this case, like most constitutional errors, is one to which the harmless error rule applies or instead is one of those rare cases where the presumption of prejudice applies.[7] If counsel’s brief absence is a type of structural error, we presume prejudice and there will be no room for the application of the harmless error rule. If it is not structural error, and no other rare exception requiring that prejudice be presumed fits, the harmless error rule applies. And, as we will explain later, the error was harmless beyond a reasonable doubt. See infra Part VI.
A. The Importance of the Harmless Error Rule and How Pervasively It Applies
The harmless error rule serves vital interests, chief of which is conserving scarce judicial resources by avoiding pointless retrials. Applying the rule to determine whether error, including constitutional error, affected the result of a trial is also essential to avoid a “sporting theory of justice” and a regime of gotcha review. See United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) (quotation marks omitted).
“Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.” Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436 (quotation marks omitted). The Supreme Court has explained that the harmless error rule “promotes public respect for the criminal process by focusing on the underlying fairness of the trial.” Neder v. United States, 527 U.S. 1, 18, 119 S.Ct. 1827, 1838, 144 L.Ed.2d 35 (1999) (quotation marks omitted); see also Johnson v. United States, 520 U.S. 461, 470, 117 S.Ct. 1544, 1550, 137 L.Ed.2d 718 (1997) (reviewing only for plain error a violation of the Sixth Amendment right to jury, trial and deciding that “there is no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings. Indeed, it would be the *1143 reversal of a conviction such as this which would have that effect.”) (quotation marks and alterations omitted); see also 28 U.S.C. § 2111 (“On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.”); Shinseki v. Sandera, 556 U.S. 396, 407-08, 129 S.Ct. 1696, 1705, 173 L.Ed.2d 532 (2009) (construing § 2111 “as expressing a congressional preference for determining ‘harmless error’ without the use of presumptions insofar as those presumptions may lead courts to find an error harmful, when, in fact, in the particular case before the court, it is not”).
We are, after all, talking about “the harmless error rule,” not “the harmless error exception.” Because errorless trials are not expected, much less required, harmless error analysis is the rule, not the exception. How broadly the rule applies is evident from the Supreme Court’s observation that: “Since this Court’s landmark decision in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless.” Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991) (emphasis added). The Court drove home that point by listing in the Fulminante opinion 16 different constitutional violations that it had held are subject to the harmless error rule. And the decision in Fulminante became a 17th example by holding that admission of a coerced confession is another error that can and should be reviewed for harmlessness. Id. at 306-09, 111 S.Ct. at 1263-64. See infra at 1167-68.
The dissenting opinion seeks to sweep away the important point that the Supreme Court made in Fulminante when it listed 16 constitutional errors (plus the one in that case itself) that have been held to be subject to harmless error analysis instead of a presumption of prejudice.[8] See infra at 1167. The dissent would replace the Supreme Court’s instruction in Fulmi-nante about the breadth of the harmless error rule with an alternative message that only “unimportant and insignificant” constitutional errors are subject to harmless error review under Chapman. See Dissenting Op. at 1230. But under Chapman constitutional errors are not to be classified by the importance or significance of the constitutional right that was violated but by the effect of the violation “in the setting of a particular case.” See Chapman, 386 U.S. at 22, 87 S.Ct. at 827. That is why, as the Court’s Fulminante list shows, the harmless error rule has been applied to all types of constitutional errors, including: defects of every sort in jury instructions; restrictions on the right to cross-examine adverse witnesses; improper comments on the right to remain silent at trial; violation of the right of the defendant to be present at trial; admission of a coerced confession; admission of evidence in violation of the right to counsel; and denial of counsel at a preliminary hearing. See infra at 1167. Those violations do not involve “unimportant and insignificant” constitutional rights, but the Court has applied the harmless error rule to them nonetheless.
*1144 B. The Cronic Exception
For virtually every rule of law, however, there is an exception or two, sometimes more. One of those exceptions at issue in this appeal is the Cronic exception, which provides that prejudice is to be presumed, and therefore the harmless error rule does not apply, when a criminal defendant has been completely denied the right to counsel for a critical stage of the trial, which is an error that contaminates the entire proceeding. See United States v. Cronic, 466 U.S. 648, 659 & n.25, 104 S.Ct. 2039, 2047 & n.25, 80 L.Ed.2d 657 (1984). When an error of that magnitude happens, we do not ask whether the error was harmless; we irrebutably presume that it was harmful. See id.; see also Bell v. Cone, 535 U.S. 685, 695-96, 122 S.Ct. 1843, 1850-51, 152 L.Ed.2d 914 (2002) (noting that Cronic “identified three situations implicating the right to counsel” in which prejudice to the defense could be presumed). Roy’s primary contention is that his counsel’s brief absence from the courtroom is Cronic error. It is not.
The Cronic decision limited the presumption of prejudice to cases where defense counsel “entirely fails to subject the prosecution’s case to meaningful adversarial testing” in the trial or where there is “the complete denial of counsel” at a “critical stage of [the] trial.” Cronic, 466 U.S. at 659, 104 S.Ct. at 2047 (emphasis added). Roy has never contended, and could not contend, that his counsel entirely failed to subject the prosecution’s case to meaningful testing. Defense counsel was present during 99.6 percent of Roy’s trial, and he vigorously represented Roy. Among other things, he cross-examined nine of the government’s 13 witnesses, including Deputy Longson whom he cross-examined for 45 pages of the trial transcript. Counsel also called his own competing expert witness in an attempt to rebut Longson’s testimony. And he gave a vigorous closing argument. In sum, Roy’s counsel did “subject the prosecution’s case to meaningful adversarial testing.” Id.
Instead of questioning the effectiveness of his representation, Roy contends his case falls within the Cronic exception because his counsel’s brief absence during one small part of the testimony of one of the 13 government witnesses against him amounts to denial of counsel during a critical stage of the trial. We turn now to the critical stage requirement that must be met before an error will be found to fit within the Cronic exception to the prejudice requirement and the harmless error rule. See id.
The last time that we sat en banc in a case involving a Cronic issue, we emphasized that the exception applied “to only a very narrow spectrum of cases” where “the defendant was in effect denied any meaningful assistance at all.” Stano v. Dugger, 921 F.2d 1125, 1153 (11th Cir. 1991) (en banc) (emphasis added) (quotation marks omitted); see United States v. Kaid, 502 F.3d 43, 46 (2d Cir. 2007) (expressing “reluctance to extend a rule of per se prejudice in any new direction”) (quotation marks omitted). And we emphasized that the burden of establishing that an error warrants Cronic’s presumption of prejudice is “a very heavy one.” Stano, 921 F.2d at 1153 (quotation marks omitted).
The difficulty of carrying that “very heavy” burden and the “very narrow” scope of the Cronic exception are evident from the fact that the Supreme Court has repeatedly refused to find it applicable. The Court has held that the Cronic exception did not apply, and the usual showing of actual prejudice was required, where trial counsel failed to present any mitigating evidence or make any final argument during the penalty phase of a capital trial. Bell, 535 U.S. at 692-98, 122 S.Ct. at 1849-52. And the Court has held that the Cronic *1145 exception did not apply and a showing of actual prejudice was required where trial counsel, without the defendant’s consent, conceded that the defendant was guilty of capital murder as part of his strategy to avoid a death sentence. Florida v. Nixon, 543 U.S. 175, 178, 190-92, 125 S.Ct. 551, 555, 562-63, 160 L.Ed.2d 565 (2004). Only once in the 30 years since the Cronic decision was issued has the Supreme Court applied Cronic to presume prejudice. See Penson v. Ohio, 488 U.S. 75, 88, 109 S.Ct. 346, 354, 102 L.Ed.2d 300 (1988) (holding that “the presumption of prejudice must extend as well to the denial of counsel on appeal” when the granting of an attorney’s motion to withdraw had left the petitioner “entirely without the assistance of counsel on appeal”). The scope of the Cronic exception is that narrow; the burden of showing it applies is that heavy.
Even in Cronic itself the Court did not find that the Cronic exception to the harmless error rule applied. That case involved a woefully inexperienced, young attorney who had been appointed to serve as counsel less than a month before trial in a complex mail fraud case, a case that the government had investigated for over four- and-a-half years during which it had reviewed thousands of documents. Cronic, 466 U.S. at 649, 104 S.Ct. at 2041. Despite those extreme facts, the Supreme Court refused to presume prejudice, requiring instead that the defendant show that he actually was prejudiced. Id at 662-66, 104 S.Ct. at 2049-50. The Court remanded the case for the court of appeals to determine whether the defendant could establish deficient performance and prejudice, as required by Strickland v. Washington. Id. at 666-67, 104 S.Ct. at 2051.
The Supreme Court’s insistence on confining the Cronic exception within narrow boundaries is evident from the fact that in Nixon, Bell, and Cronic itself the Court reversed the decisions of lower courts that had held the exception applied and had presumed prejudice. See Nixon, 543 U.S. at 189-93, 125 S.Ct. at 561-63; Bell, 535 U.S. at 688, 702, 122 S.Ct. at 1847, 1854; Cronic, 466 U.S. at 666-67, 104 S.Ct. at 2051. And in all of those cases, the risk of prejudice to the defendant was much greater than the risk of prejudice to Roy from his lawyer’s seven-minute absence during a six-day trial.
One way that the Supreme Court has ensured that the Cronic exception will remain rare, the scope of the decision will be narrow, and the burden of establishing the exception will be heavy is by requiring that there be a complete denial or total failure of counsel, if not at trial generally, at least at a critical stage of the prosecution. See Cronic, 466 U.S. at 659, 104 S.Ct. at 2047 (“The presumption that counsel’s assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.”); see also Bell, 535 U.S. at 697, 122 S.Ct. at 1851 (noting that counsel’s failure to test the prosecution’s case “at specific points” does not rise to the level of Cronic error).
In the Cronic opinion itself, the Court’s examples of a critical stage include Hamilton v. Alabama, 368 U.S. 52, 54-55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961), where prejudice was presumed when the defendant was entirely denied any counsel throughout all of his arraignment, and White v. Maryland, 373 U.S. 59, 59-60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963), where prejudice was presumed after the defendant was entirely denied counsel throughout all of his preliminary hearing. See Cronic, 466 U.S. at 659 n.25, 104 S.Ct. at 2047 n.25; see also Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984) (“Actual or constructive denial of the assistance of *1146 counsel altogether is legally presumed to result in prejudice.”) (emphasis added).
Roy’s position depends on his proposition that what took place during the seven minutes when his counsel was out of the courtroom is unto itself a critical stage of the trial. If the 18 answers that counsel missed hearing from one government witness, but of a total of 2,745 answers from 13 government witnesses during the trial, do not by themselves constitute a separate stage of the trial, Roy’s Cronic argument fails. So Roy argues, as he must, that what occurred during those seven minutes must be considered by itself to be “a critical stage of his trial.” Cronic, 466 U.S. at 659, 104 S.Ct. at 2047.[9]
What, then, is a “critical stage” of a trial? We, like the Sixth Circuit, “would welcome a comprehensive and final one-line definition of ‘critical stage’ ” for the purposes of determining whether error is Cronic error. Van v. Jones, 475 F.3d 292, 312 (6th Cir. 2007). None exists, as that court recognized. H. We do not, however, need a comprehensive or pithy definition of the term to conclude that the brief period during which Roy’s counsel was absent from the courtroom is not itself a critical stage of the trial. If we held that seven minutes of a six day trial, and 18 answers from one of 13 government witnesses, who gave a total of 2,745 answers during their testimony, amounts to a stage of a trial, we would have to conclude that the presentation of the government witnesses at Roy’s trial was a collection of 152 separate critical stages (2,745 ÷ 18 = 152.5) not even counting other parts of the trial. If we did that, Cronic’s “very narrow” exception would be very broad, contrary to what the Supreme Court and this Court stated. See Stano, 921 F.2d at 1153.
If 18 answers from one of 13 witnesses against a defendant were enough to be a critical stage, what would not be? Would a single question and inculpatory answer from a government witness be enough to constitute a critical stage of the trial? Under Roy’s extreme view it would be. He argues that: “The presentation of inculpa-tory testimony by a government witness is a critical stage of trial.” En Banc Br. of Appellant at 14. The dissenting opinion agrees with that view. If counsel misses even one inculpatory answer from a government witness, in the dissent’s view that’s it, irreparable error has been committed no matter what happens in the rest of the trial. But it cannot be the law that every inculpatory answer given by every government witness (or defense witness on cross-examination) is a separate stage of the proceedings against the defendant. Trials don’t consist of thousands of critical stages.
Although the brevity of counsel’s absence in this case and how little he missed is striking, it’s not merely the fleeting nature of the absence that convinces us that counsel was not gone during an entire “stage of [the] trial.” See Cronic, 466 U.S. at 659, 104 S.Ct. at 2047. Length alone does not always define a stage of a trial. Depending on the circumstances, an arraignment could take 10 minutes or less, although it is a critical stage. See Bell, 535 U.S. at 695-96, 122 S.Ct. at 1851.
The Supreme Court has instructed us that it has used the term “critical stage” “to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused.” Bell, 535 U.S. at 695-96, 122 S.Ct. at 1851. And decision after decision shows that what the Court means when it does use the term *1147 “stage” for Cronic purposes is a qualitatively distinct, discrete, and separate phase or step of a criminal proceeding where the defendant has a right to counsel, such as an arraignment, a post-indictment lineup, a preliminary hearing, a plea hearing, closing arguments as a whole, or a sentence proceeding as a whole. See Montejo v. Louisiana, 556 U.S. 778, 786, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009) (describing post-indictment interrogation as a critical stage); Iowa v. Tovar, 541 U.S. 77, 87, 124 S.Ct. 1379, 1387, 158 L.Ed.2d 209 (2004) (“A plea hearing qualifies as a ‘critical stage.’ ”); Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977) (“[Sentencing is a critical stage of the criminal proceeding at which [the defendant] is entitled to the effective assistance of counsel.”); Gilbert v. California, 388 U.S. 263, 272, 87 S.Ct. 1951, 1956, 18 L.Ed.2d 1178 (1967) (“[A] post-indictment pretrial lineup ... is a critical stage of the criminal prosecution....”); White, 373 U.S. at 59-60, 83 S.Ct. at 1051 (“Whatever may be the normal function of the ‘preliminary hearing’ under Maryland law, it was in this case as ‘critical’ a stage as arraignment. ...”); Hamilton, 368 U.S. at 53, 82 S.Ct. at 158 (describing arraignment as “a critical stage in a criminal proceeding”).
In conformity with what the Supreme Court has done in this area, our sister circuits generally treat “stage” in “critical stage” as meaning either a self-contained proceeding or a discrete and separately identifiable portion of a larger proceeding. See, e.g., United States v. Ross, 703 F.3d 856, 873-74 (6th Cir. 2012) (deciding that a competency hearing is a critical stage); McNeal v. Adams, 623 F.3d 1283, 1285, 1289 (9th Cir. 2010) (after considering several factors that might “make a proceeding a critical stage,” holding that a hearing on a motion to compel the defendant to provide a DNA sample is not a critical stage) (emphasis added); McDowell v. Kingston, 497 F.3d 757, 762-63 (7th Cir. 2007) (explaining that no Supreme Court authority indicates “that [a defendant’s] testimony, isolated from the rest of his defense, constitutes a critical stage of the litigation,” and holding that even the complete testimony of the defendant is not a critical stage); Harrington v. Gillis, 456 F.3d 118, 132 (3d Cir. 2006) (noting that “an appeal is a critical stage of criminal proceedings”) (emphasis added); United States v. Sanchez-Barreto, 93 F.3d 17, 20 (1st Cir. 1996) (noting that a “plea withdrawal hearing” is a critical stage) (emphasis added).
Those decisions of the Supreme Court and of other circuits are consistent with the everyday definition of “stage” as “a single step or degree in a process; a particular phase, period, position, etc., in a process, development, or series.” Stage, Random House Webster’s Unabridged Dictionary (2d ed. 2001) 1853-54. In our lives, as well as throughout the law, when we refer to “stages” we do not mean fleeting moments or small parts of events. Instead, we use the word to refer to larger, discrete component parts of a process that share a common characteristic. For example, adolescence is a stage of life, but we would never speak or think of every minute, hour, or day during adolescence by itself as a separate or discrete stage of life.
The 18 questions and answers that Roy’s counsel missed do not fit any accepted definition of “stage” or “critical stage.” They do not constitute a separate step in the process of the trial, or a discrete phase of it. Not only are they not a stage of the trial, those 18 questions and answers are not even an identifiable stage of Deputy Longson’s testimony. They are just a small part of it — only three transcript pages out of 177 total pages of his testimony. Nothing but counsel’s absence marks the 18 questions to Longson as different from all of the others put to him before lunch or all of those put to him after he returned to *1148 the courtroom following lunch. They are all questions and answers of the same type as those that preceded and followed them, and they occurred during direct examination of the same one of the 13 government witnesses, asked by the same government lawyer. The 18 questions and answers counsel missed are just a small part of the more than 2,500 that occurred during the six-day trial. Not only that, but all of those 18 questions were repeated after counsel returned to the courtroom.
The only defining characteristic of what took place in the trial during the seven minutes while Roy’s counsel was absent is that it occurred while Roy’s counsel was absent. Roy would have us define “stage” to equate with the absence of an attorney so that anything that happened in a trial during the absence of an attorney, however brief it was, would be a stage of the trial. That definition is hopelessly circular. Because the brief period during which Roy’s counsel was absent is not itself a “stage of his trial,” Roy did not suffer “the complete denial of counsel” for “a critical stage of his trial.” Cronic, 466 U.S. at 659, 104 S. Ct at 2047. For that reason, there was no Cronic error in this ease.
We will discuss the Cronic “critical stage” arguments of Roy and the dissent now. After doing that, we will turn to the related but different question of whether a presumption of prejudice should arise when defense counsel is absent from a substantial portion of the trial.
1. The Geders, Herring, and Brooks Decisions
The dissenting opinion relies on Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), and Brooks v. Tennessee, 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972), which it contends involved “the denial of counsel ‘at a critical stage of ... trial.’ ” Dissenting Op. at 1244 & n.14 (alteration in original) (emphasis omitted) (quoting Cronic, 466 U.S. at 659, 104 S.Ct. at 2047). That interpretation ignores the unique type of constitutional violations those cases involved and it ignores what the Court later said about those decisions. See Perry v. Leeke, 488 U.S. 272, 279-80, 109 S.Ct. 594, 599-600, 102 L.Ed.2d 624 (1989).
In its pre-Cronic decision of Geders, the Court applied a presumption of prejudice to a Sixth Amendment violation that occurred when the trial court barred defense counsel from advising or otherwise assisting his client during a 17-hour recess. 425 U.S. at 91, 96 S.Ct. at 1337. The order had prevented the defendant from discussing important matters with counsel, including “tactical decisions to be made and strategies to be reviewed.” Id. at 88, 96 S.Ct. at 1335. The Geders decision did not explicitly apply the “critical stage” rule or analysis; in fact, the opinion does not mention the term “critical stage” or even the word “stage.”
Instead, as the Court explained later, Geders was one of a line of decisions presuming prejudice where a defense attorney was prevented from, or impeded in, rendering assistance of counsel to his client because of an unconstitutional statute or court order. See Perry, 488 U.S. at 279-80, 109 S.Ct. at 599-600. Recognizing that special subtype of Sixth Amendment violation, as the Court pointed out in Perry, is consistent with what Strickland itself held. Id. at 279, 109 S.Ct. at 599. While shortcomings and failures of counsel require a petitioner to show prejudice from the deficient performance, “direct governmental interference with the right to counsel is a different matter.” Id. The Perry Court quoted the following passage from Strickland to drive home the point:
Government violates the right to effective assistance when it interferes in *1149 certain ways with the ability of counsel to make independent decisions about how to conduct the defense. See, e.g., Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330 [47 L.Ed.2d 592] (1976) (bar on attorney-client consultation during overnight recess); Herring v. New York, 422 U.S. 853, 95 S.Ct. 2550 [45 L.Ed.2d 593] (1975) (bar on summation at bench trial); Brooks v. Tennessee, 406 U.S. 605, 612-13, 92 S.Ct. 1891, 1895 [32 L.Ed.2d 358] (1972) (requirement that defendant be first defense witness); Ferguson v. Georgia, 365 U.S. 570, 593-96, 81 S.Ct. 756, 768-70 [5 L.Ed.2d 783] (1961) (bar on direct examination of defendant).
Id. at 280, 109 S. Ct. at 599 (citations altered) (quotation marks omitted).
The statutory or court-ordered interference exception to the prejudice requirement that was applied in Geders, Herring, and Brooks, that was recognized in Strickland, and that was discussed in Perry, does not apply in this case and does not govern our critical stage analysis. No statute or court-ordered bar kept Roy’s trial counsel out of the courtroom for those seven minutes following lunch on the second day of trial. And no statute or court order interfered with the ability of Roy’s counsel to make independent decisions about how to conduct the defense.
2. The Gonzalez-Lopez, Woods, and Williams Decisions
The dissenting opinion also relies heavily on the Supreme Court’s decision in United States v. Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), which did not involve an attorney’s brief absence from the courtroom. Instead, it involved a complete violation of “the right of a defendant who does not require appointed counsel to choose who will represent him.” Id. at 144, 126 S.Ct. at 2561; see id. at 143-44, 126 S.Ct. at 2561 (holding that the district court’s erroneous rulings “violated respondent’s Sixth Amendment right to paid counsel of his choosing”); ⅛ at 146, 126 S.Ct. at 2562 (“[T]he right at stake here is the right to counsel of ehoice[.]”); id. at 147, 126 S.Ct. at 2563 (“The right to select counsel of one’s choice, by contrast [to the right to effective assistance of counsel], has never been derived from the Sixth Amendment’s purpose of ensuring a fair trial.”); id. at 152, 126 S.Ct. at 2566 (“[T]he Government has conceded that the District Court here erred when it denied respondent his choice of counsel.”).
The deprivation of the right to retained counsel of choice in Gonzalez-Lopez was anything but momentary; it lasted longer than the trial itself. It was complete, lasting throughout the entirety of the opening statements, the presentation of all of the prosecution’s case, the presentation of all of the defense case, the closing arguments, the jury instructions, the return of the verdict, and the post-verdict proceedings. Id. at 142-14, 126 S.Ct.-at 2560-61. As the Supreme Court noted, “the deprivation of choice of counsel pervade[d] the entire trial.” Id. at 150, 126 S.Ct. at 2565. As a result, the start-to-finish “erroneous deprivation of the right to counsel of choice” in Gonzalez-Lopez had “consequences that are necessarily unquantifiable and indeterminate” and “unquestionably qualifies as ‘structural error.’ ” Id. at 150, 126 S Ct. at 2564 (quotation marks omitted).[10]
*1150 The Supreme Court explained in some detail why it would be impossible to apply the harmless error rule and gauge the prejudicial effect of depriving a defendant of the attorney he had retained and forcing him to use a different one during the entire trial and post-trial stages:
Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the “framework within which the trial proceeds,” Fulminante, supra, at 310, 111 S.Ct. 1246 — or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.
Id. at 150, 126 S. Ct. at 2564-65. The Court also explained the difference between the denial of retained counsel of choice and more typical ineffective assistance violations:
[I]f and when counsel’s ineffectiveness “pervades” a trial, it does so (to the extent we can detect it) through identifiable mistakes. We can assess how those mistakes affected the outcome. To determine the effect of wrongful denial of choice of counsel, however, we would not be looking for mistakes committed by the actual counsel, but for differences in the defense that would have been made by the rejected counsel — in matters ranging from questions asked on voir dire and cross-examination to such intangibles as argument style and relationship with the prosecutors. We would have to speculate upon what matters the rejected counsel would have handled differently — or indeed, would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors. And then we would have to speculate upon what effect those different choices or different intangibles might have had. The difficulties of conducting the two assessments of prejudice are not remotely comparable.
Id. at 150-51, 126 S. Ct. at 2565. Those explanations underscore how distinguishable the Gonzalez-Lopez case is from this one.
None of the Supreme Court’s reasoning about why it is impossible to gauge the prejudicial impact of forcing a different attorney on the defendant throughout the entire trial and post-trial stages of a case applies to a seven-minute absence of counsel during a six-day trial when the missed testimony was not only transcribed for review but was also repeated in the presence of counsel after he returned (and as repeated was transcribed again).
The momentary absence of counsel from the courtroom in this case is entirely different from the complete denial of counsel of choice throughout the Gonzalez-Lopez case. A momentary absence, unlike a complete denial of counsel of choice, does not *1151 affect the choice of “strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument.” Id. at 150, 126 S.Ct. at 2564. It does not “affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial.” Id. It does not require us to consider, as courts would with a complete denial of counsel of choice, “such intangibles as argument style and relationship with the prosecutors,” or what things the denied counsel “would have handled differently — or indeed, would have handled the same but with the benefit of a more jury-pleasing courtroom style or a longstanding relationship of trust with the prosecutors.” Id. at 151, 126 S.Ct. at 2565. The denial of counsel of choice “bears directly on the framework within which the trial proceeds — or indeed on whether it proceeds at all.” Id. at 150, 126 S.Ct. at 2564-65 (quotation marks and citation omitted). The momentary absence of Roy’s counsel from the courtroom does not.
To borrow the Supreme Court’s words, “[t]he difficulties of conducting the two assessments of prejudice are not remotely comparable.” Id. at 151, 126 S.Ct. at 2565. They are not comparable because what Roy’s momentarily absent counsel would have done, or should have done, had he been present are “identifiable mistakes,” and “[w]e can assess how those mistakes affected the outcome.” Id. at 150-51, 126 S.Ct. at 2565; see infra Part VI (explaining why the error was harmless beyond a reasonable doubt in this ease).[11]
The dissent also goes astray in its reading of Woods v. Donald, 575 U.S. -, 135 S.Ct. 1372, 191 L.Ed.2d 464 (2015) (per curiam), a decision that actually reversed a grant of habeas relief based on a lower court’s holding that Cronic error occurred when defense counsel was absent for 10 minutes during the testimony of a prosecution witness. See Dissenting Op. at 1240. The Sixth Circuit had held that the state court decision denying the petitioner habe-as relief because of that 10-minute absence was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court within the meaning of 28 U.S.C. § 2254(d)(1). 135 S.Ct. at 1375. In reversing the Sixth Circuit, the Supreme Court pointed out that none of its own holdings have addressed defense counsel’s absence during the presentation of testimony that is irrelevant to the defendant’s theory of the case. Id. at 1377. It did not hold or say, however, that a brief absence during testimony that is relevant to the defendant’s theory of the case is Cronic error. In fact, the Court cautioned that it was expressing “no view on the merits of the underlying Sixth Amendment principle,” because “[a]ll that matters here, and all that should have mattered to the Sixth Circuit, is that we have not held that Cronic applies to the circumstances presented in this case.” Id. at 1378 (quotation marks omitted).
Despite that caution, the dissent insists that more mattered in the Woods decision than the Supreme Court realized. What the Court failed to realize, according to the dissent, is that despite its protestations to the contrary, it was offering “valuable insight into the type of distinctions the Court may make if and when it takes such a case on direct review.” Dissenting Op. at 1241 n.ll. So what should we believe — the *1152 Supreme Court’s emphatic statement that it was expressing “no view on the merits of the underlying Sixth Amendment principle,” or the dissent’s insistence that yes it was? We choose to believe the Supreme Court meant what it said. See Mathis v. United States, 579 U.S. -, 136 S.Ct. 2243, 2254, 195 L.Ed.2d 604 (2016) (“[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same.... ”).
The dissent also relies on the decision in Williams v. Pennsylvania, 579 U.S. -, 136 S.Ct. 1899, 195 L.Ed.2d 132 (2016). Dissenting Op. at 1245-46. But that decision dealt solely with structural error involving a biased judge. It had nothing to do with a brief absence of defense counsel from the courtroom. To the extent that the dissent cites it for the proposition that structural error requires reversal, the answer is that of course it does but there was no structural error in this case.
3. The Vines Decision
Except in the now-vacated panel decision in this case, we have not yet decided whether the brief absence of counsel during the presentation of testimony that directly inculpates the defendant is Cronic error. A couple of decades ago a panel of this Court did decide that the absence of defense counsel while government witnesses gave testimony that did not directly inculpate the defendant was not Cronic error. Vines v. United States, 28 F.3d 1123, 1128 (11th Cir. 1994). The case involved a two-defendant, two-day drug trial, and at 4:15 p.m. on the first day counsel for Vines left “for the remainder of the day” for some undisclosed reason. Id. at 1125. The opinion does not disclose how much of the trial day remained when counsel left, but it does reveal that during counsel’s absence, an FBI agent and another government witness testified. Id. at 1126. The FBI agent testified, among other things, about how the manner of shipping that the defendants used in that case “fit the modus operandi of contraband smugglers.” Id
Vines was convicted on the conspiracy charge and acquitted on the distribution charge, and he argued on appeal from the denial of his 28 U.S.C. § 2255 motion that the absence of his counsel during the testimony of those two government witnesses was a Sixth Amendment violation that entitled him to have his conviction set aside. Id. at 1126-27. After noting that the Strickland decision applies only where counsel is present, the Court assumed, without deciding, that the absence of counsel during the taking of testimony is constitutional error. Id. at 1127-28. It addressed Vines’ argument that the absence of his counsel from the trial was not only a Sixth Amendment violation but also Cronic error giving rise to an irrebutable presumption of prejudice. Id. at 1127-28. The Court reasoned that “Cronic’s presumption of prejudice applies to only a very narrow spectrum of cases,” and concluded that Vines was not one of those rare cases. Id. at 1128 & n.8 (quotation marks omitted).
In reaching that conclusion, the Court rejected Vines’ argument “that under Cronic the taking of evidence is a critical stage of trial per se,” and stated that “we decline to give birth to a rule that the taking of evidence is necessarily a critical stage of trial.” Id. at 1128. After reviewing the record, it found that “no evidence directly inculpating Vines was presented during his counsel’s absence.” Id. The holding of Vines fitted to the facts before the Court was that: “Where, as in this case, no evidence directly inculpating a defendant is presented while that defendant’s counsel is absent, we decline to hold that counsel was absent during a critical stage of trial within the meaning of Cronic.” Id.
*1153 While panel decisions do not bind us when we sit en bane, we find persuasive the Vines holding that the taking of testimony or other evidence that only indirectly inculpates the defendant is not a critical stage of the trial. As the Court said there: “While trial counsel may exercise poor judgment in absenting himself or herself from a portion of a trial, such flawed judgment does not necessarily infect the entire trial.” Id. at 1129. Counsel’s absence was neither Cronic error nor some other type of structural error but instead was trial error “capable of quantitative assessment” and subject to the harmless error rule. Id.
That is all that the Vines decision did hold or could hold. It did not hold — and because the facts of that case did not present the issue it could not have held— that the taking of any testimony that does directly inculpate the defendant is a critical stage of the trial for Cronic purposes. See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) (“[J]u-dicial decisions cannot make law beyond the facts of the cases in which those decisions are announced.”); see also Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1031 (11th Cir. 2003); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000).
4. The Decisions of Other Circuits
A handful of other circuits have addressed Cronic issues arising from counsel missing part of a trial. Some of the cases giving rise to those issues are more factually similar to this one than others are. And some of those decisions are more persuasive than others.
i. The Out-of-Circuit Decisions Roy Relies On
Roy argues that some decisions from other circuits support his bold claim that any inculpatory testimony, however brief, constitutes a critical stage of any trial regardless of the circumstances. See Bur dine v. Johnson, 262 F.3d 336 (5th Cir. 2001) (en banc); United States v. Russell, 205 F.3d 768 (5th Cir. 2000); Olden v. United States, 224 F.3d 561 (6th Cir. 2000); Green v. Arn, 809 F.2d 1257 (6th Cir. 1987), vacated on other grounds, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987), reinstated, 839 F.2d 300 (6th Cir. 1988). All four of those decisions are readily distinguishable.
In two of them, Russell and Olden, counsel was absent for more than an entire day of trial. The Fifth Circuit decided in Russell that the absence of a lawyer for two days of his client’s trial for drug and money-laundering conspiracy was Cronic error requiring a presumption of prejudice. See Russell, 205 F.3d at 769-70, 772-73. During his absence counsel missed the testimony of no fewer than 18 government witnesses — not questions but witnesses— and the admission of “numerous exhibits,” all of which went to prove the existence of the money-laundering conspiracy. See id. at 770. Russell’s attorney did not hear a single word of the testimony of those 18 government witnesses, nor did he have the chance to cross-examine any of them.
The difference between that case and this one is striking. While counsel in Russell missed two full days and all of the testimony of 18 government witnesses, Roy’s counsel did not miss a day, or an hour, or even 10 minutes worth of testimony of a single witness. He missed only seven minutes of the testimony of one government witness; he was present during all but three of the 177 transcript pages of that witness’ testimony; and he heard every bit of all of the testimony of the other 12 government witnesses. Not only that, but the Fifth Circuit in Russell rejected the position that Roy takes in this case. It unequivocally stated: “Russell urges this court to adopt a bright line rule that the taking of any evidence at trial in *1154 the absence of counsel is prejudicial per se under [Cronic], Cronic does not so hold and we decline to fashion such a rule.” Id. at 771 (citation omitted). We agree.
Another decision Roy relies on is Olden, where the Sixth Circuit concluded that a defense attorney’s “excessive absence” during trial amounted to Cronic error. Olden, 224 F.3d at 566, 568-70. Counsel was “absent on numerous occasions during trial,” including for two days during which he missed hearing the testimony of at least two prosecution witnesses, which incriminated his client. Id. at 568. That is obviously different from what happened here.
In the other two out-of-circuit decisions that Roy relies on, the courts were unable to determine exactly how long defense counsel had been absent during the trial. In Green, which like Olden was a Sixth Circuit decision, defense counsel was absent for at least 100 minutes of trial, during which the key government witness against his client was cross-examined by another defendant’s attorney. See Green, 809 F.2d at 1260-61. How much more than the hour and forty minutes of that important testimony counsel missed could not be determined from the record.[12] And in Bur-dine, another Fifth Circuit decision, the court found Cronic error because the capital defendant’s counsel had slept through “a not insubstantial portion of the 12 hour and 51 minute trial,” including during the prosecutor’s presentation of evidence against the defendant. 262 F.3d at 338-40, 348-49. One juror testified that he recalled counsel sleeping as many as 10 different times during the short trial. Id. at 339. By contrast, seven minutes is not a substantial portion of a six-day trial. And one absence, whether of consciousness or physically, is not 10. It is also worth noting that the Fifth Circuit explicitly stated in Burdine that its holding was “limited to the egregious facts found” in that case. Id. at 349.
All four of the cases on which Roy bases his argument do have one thing in common with each other: they are all cases in which a meaningful prejudice analysis would be difficult, if not impossible, and would consume a lot of judicial resources. In both Russell and Olden, for example, the court would have had to pore over two days of inculpatory testimony by multiple witnesses to even begin the prejudice analysis. See Russell, 205 F.3d at 769-70, 772-73; Olden, 224 F.3d at 568-69. And in *1155 Green and Burdine, the problem was even worse, because the record in those cases did not disclose exactly when counsel was absent (or in Burdine asleep), which adds a thick layer of speculation on top of that which is inherent in any kind of prejudice determination. See Burdine, 262 F.3d at 339-40; Green, 809 F.2d at 1260-62. When an appellate court knows that counsel’s absence was substantial but cannot tell exactly what testimony or other evidence counsel missed, the prejudice inquiry is more difficult and may be impossible.
That is not a problem here. We know exactly when Roy’s counsel was absent. We know exactly which 18 questions and answers he missed. We know exactly which of those 18 questions and answers were repeated after he returned to the courtroom. And we know what counsel did, and did not do, after he heard those questions asked and answered. We also know which counts of the indictment those questions and answers were directly related to and which ones they were not. Because we know all of that, and given the brevity of counsel’s absence, the prejudice inquiry in this case is not impossible; it is not even difficult. See infra Part VI.
ii. The Out-of-Circuit Decisions That Are More Analogous and Persuasive
The Second Circuit has refused to presume prejudice from defense counsel’s absence in a case that is far more similar to this one than any of those that Roy relies on. See United States v. Kaid, 502 F.3d 43 (2d Cir. 2007). In the Kaid case several codefendants were convicted of conspiring to commit money laundering and of trafficking in contraband cigarettes. Id at 45. Defense counsel for one of the codefen-dants, Azzeaz Saleh, had missed 20 minutes of the trial because he misunderstood when the judge planned to resume after a lunch break. Id. at 44-45. The trial began without him, and while he was absent the government presented evidence that was highly inculpatory of Saleh. Id at 45. Counsel missed the government showing the jury a video of Saleh and his codefen-dants purchasing the allegedly contraband cigarettes, and counsel missed a witness testifying that at nine separate points the video showed Saleh. Id.
Saleh argued on appeal that he was entitled to a presumption of prejudice because his attorney had been absent during a critical stage of the trial. Id. at 45-46. The Second Circuit unequivocally rejected that argument. Id at 46-47. It affirmed Saleh’s convictions after concluding that he had not shown that he was prejudiced by his counsel’s 20-minute absence because (1) counsel had been able to challenge the admissibility of the identification testimony the day before he was absent from the courtroom, and (2) after counsel returned to the courtroom he had been able to cross-examine the witness who had repeatedly identified Saleh in the video. Id. at 45, 47.
The Second Circuit’s decision that the presumption of prejudice did not apply in that case is important. The circumstances in Roy’s case are even stronger for affir-mance, not only because the absence in Kaid was nearly three times as long as the absence in Roy’s case, but also because there is no indication in the Kaid opinion that the evidence counsel missed was repeated after counsel returned to the courtroom, as it was in Roy’s case. See generally 502 F.3d 43.
The Second Circuit in Kaid is not alone in its analysis or conclusion. In our view, the best reasoned out-of-circuit decision holding that a brief absence of counsel is not structural error is the Eighth Circuit’s in the Sweeney case. See Sweeney v. United States, 766 F.3d 857 (8th Cir. 2014). In that case, defense counsel left the courtroom and went to the restroom during the *1156 direct examination of a key prosecution witness — a co-conspirator who had flipped and was providing inculpatory testimony against the defendant. Id. at 859. While counsel was out of the courtroom, the cooperating co-conspirator witness answered 43 of the prosecutor’s questions (as compared to 18 questions in Roy’s case) covering six transcript pages (as compared to three in Roy’s case). See M. at 859, 861; Redacted Trial Tr. at 122-29, United States v. Sweeney, No. 06-CR-0249(PJS) (D. Minn. July 22, 2009) (ECF No. 390). That is twice as many transcript pages of testimony and more than twice as many questions and answers as counsel missed in Roy’s case.
Sweeney was a 28 U.S.C. § 2255 proceeding, and the certificate of appealability stated the issue as whether “the actual absence of counsel for a brief period of time during the direct testimony of a government witness [was] subject to harmless-error analysis.” Id. at 858. The parties agreed, and the Eighth Circuit recognized, that the absence of counsel, which the judge knew about and permitted without Sweeney’s consent, was a violation of the Sixth Amendment right to counsel. Id. at 859-60. Sweeney argued “that in light of Cronic, the error is a structural defect that is presumptively prejudicial and requires reversal,” while the government countered “that because of the brevity of Sweeney’s counsel’s absence, it amounted to nothing more than a trial error subject to a harmless-error analysis.” Id. at 860.
In its analysis, the Eighth Circuit noted that: “The Supreme Court has divided constitutional violations that occur during a criminal proceeding into two categories: trial errors and structural defects.” Id. It looked to, and quoted from, Supreme Court decisions for the definition of those terms: “A ‘trial error’ is an error that may ‘be quantitatively assessed in the context of other evidence presented,’ and is subject to harmless-error analysis.” Id. (quoting Fulminante, 499 U.S. at 307-08, 111 S.Ct. at 1264). By contrast, a “ ‘structural defect’ is something that ‘affects the framework within which the trial proceeds, rather than simply an error in the trial process itself and thus ‘defies analysis by “harmless-error” standards.’ ” Id. (quoting Fulminante, 499 U.S. at 309-10, 111 S.Ct. at 1265) (alterations omitted).
The Eighth Circuit pointed out that “[t]he Supreme Court has recognized that most constitutional errors can be harmless, and that structural defects are the exception and not the rule.” Id. (citation and quotation marks omitted). It quoted a Supreme Court’s decision holding that “[o]nly structural defects that undermine ‘the fairness of a criminal proceeding as a whole require reversal without regard to the mistake’s effect on the proceeding.’ ” Id, (quoting United States v. Dominguez Benitez, 542 U.S. 74, 81, 124 S.Ct. 2333, 2339, 159 L.Ed.2d 157 (2004)) (alterations omitted). The harmless error rule applies to everything else, or as the Supreme Court put it in the decision the Eighth Circuit quoted, except for defects that undermine the fairness of the entire criminal proceeding, “relief for error is tied in some way to prejudicial effect.” Dominguez Benitez, 542 U.S. at 81, 124 S.Ct. at 2339.
The Eighth Circuit also relied on the Supreme Court’s holding in Satterwhite that “those ‘Sixth Amendment violations that pervade the entire proceeding’ can ‘never be considered harmless.’ ” M. at 860-61 (quoting Satterwhite, 486 U.S. at 256, 108 S.Ct. at 1797) (emphasis in Sweeney). Applied to counsel absences during trial, that holding means that those counsel absences extensive enough to pervade the trial process and undermine the fairness of the trial as a whole amount to Cronic or structural error. All other counsel absences are trial errors subject to the *1157 harmless error rule. And the court concluded that “Sweeney’s counsel’s brief absence was not a ‘complete’ absence because it only lasted three minutes,” and “the brevity of the absence distinguishes this case from the ‘complete denial of counsel’ discussed in Cronic.” Id. at 861 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. at 2047) (emphasis in Sweeney).
In affirming the rejection of Sweeney’s Cronic claim, the Eighth Circuit quoted part of the district court’s reasoning in that case, which is worth requoting here. This is what the Eighth Circuit by adoption said about why the circumstances in that case (which are materially identical to those in this case) are well-suited for harmless error analysis:
The fact that the record demonstrates precisely what [Sweeney’s counsel] missed while he was out of the room— and the fact that his absence was so brief — allows the Court to confidently assess whether Sweeney was harmed by [his counsel’s] absence. Indeed, the Court is far better equipped to conduct a harmless-error analysis in this case than it is in other contexts, in which a substantial amount of speculation is unavoidable.
Id. (quoting the district court) (alterations in original). The court in Sweeney knew exactly what counsel missed because it had a transcript of the testimony taken while he was gone, just as we do in this case.
The reasoning in Sweeney, which we adopt, dovetails with the Supreme Court’s explanation of its decision in Satterwhite. See 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284. The Sixth Amendment error in Satterwhite occurred when a psychiatrist for the State testified at a capital sentencing proceeding based on what the defendant had told him during an examination conducted without the knowledge of his attorney in violation of Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Satterwhite, 486 U.S. at 251-55, 108 S.Ct. at 1795-96. In determining that the Sixth Amendment violation resulting from admission of the psychiatrist’s testimony was not structural error but was instead trial error subject to review for harmlessness, the Supreme Court explained:
We have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial. In Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), for example, the Court held the admission of a confession obtained in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), to be harmless beyond a reasonable doubt. And we have held that harmless error analysis applies to the admission of identification testimony obtained in violation of the right to counsel at a postindictment lineup. Moore v. Illinois, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (capital case); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Just last year we indicated that harmless error analysis would apply in a noncapital case to constitutional error in the use of a psychological evaluation at trial. Buchanan v. Kentucky, 483 U.S. 402, 425, n.21, 107 S.Ct. 2906, 2919, n.21, 97 L.Ed.2d 336 (1987).
Id. at 257-58, 108 S.Ct. at 1798 (emphasis added) (citations reformatted).
The Sixth Amendment violation in Roy’s case did not occur merely because counsel was late coming back from lunch. Tardiness does not violate the Constitution. The Sixth Amendment violation occurred because a government witness answered 18 *1158 questions in counsel’s absence. The constitutional error was in admitting that particular evidence, those answers, without counsel being there. And, as the Supreme Court held in Satterwhite and in five other decisions that it cited, harmless error analysis applies “where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial.” Id at 257, 108 S.Ct. at 1798. It applies here.[13]
5. The Dissent’s “Sole Defendant” Theory
The dissent attempts to distinguish the well-reasoned decisions in Kaid and Sweeney on the ground that those cases grew out of trials with more than one defendant, while Roy was the only defendant in this trial. See Dissenting Op. at 1289-40. Indeed, at least five times the dissenting opinion appears to argue that the issue is not whether Cronic error occurs when a defendant is without counsel in the courtroom during the presentation of inculpato-ry evidence in any trial, but instead the issue is whether it is Cronic error for that to happen in a single-defendant trial. See Dissenting Op. at 1229 (“no other defendants or defense counsel present”), 1239 (“in a single-defendant trial”), at 1240 (“none [of the other cases] involved a single defendant deprived of his sole counsel”), at 1240 (“the sole defendant” in “a single-defendant, single-counsel case”), at 1246 (“in the trial of a single defendant represented by a single lawyer”).
The reasoning of the Second Circuit in Kaid and the Eighth Circuit in Sweeney applies regardless of the number of defendants on trial. Completely lacking from the dissent’s attempt to distinguish Kaid and Sweeney is any convincing explanation for why the issue should turn on whether other defendants represented by other counsel were also being tried. If a defendant’s right to counsel is violated by his attorney’s brief absence from the courtroom during inculpatory testimony against his client, there is no reason that it should matter if other attorneys representing other defendants were in the courtroom at the time his counsel was not there. The right violated is the right of each defendant to have counsel representing him, not each defendant’s non-existent right to have counsel representing his codefendants.
An attorney who represents a co-defendant has an ethical duty to zealously advance the interests of that co-defendant within the bounds of the law, even where those interests conflict with the interests *1159 of any other person who is on trial. He ethically may, in keeping with his client’s best interests — and in the finest traditions of the Bar — throw another defendant under the bus to help out his client. An attorney has no ethical duty to look after, or care about, the interests of anyone else regardless of whether their attorney is present. As the dissent states elsewhere in its opinion, defense counsel is “both his client’s mouthpiece and his client’s confidant.” Dissenting Op. at 1248. An attorney for a co-defendant is not another defendant’s mouthpiece and confidant. He is not, as the dissent seems to believe, alternate defense counsel for any or all other co-defendants. Because the presence or absence of other counsel for other defendants is legally and logically irrelevant to the Cronic or structural error issue, the Kaid and Sweeney decisions are not distinguishable on that basis.[14]
Because there is no principled way to limit an application of Cronic to single-defendant trials, a holding in favor of Roy would have far-reaching effects. As the dissenting opinion at the panel stage warned, if Roy’s position were adopted:
Whatever measures a judge takes in response to today’s [panel] ruling, it will be practically impossible to prevent presumptive prejudice error in a large, mul-tidefendant, long-running trial. See Green v. Arn, 809 F.2d 1257, 1265 (6th Cir.) (Boggs, J., dissenting), vacated and remanded on other grounds, 484 U.S. 806, 108 S.Ct. 52 [98 L.Ed.2d 17] (1987), reinstated on remand, 839 F.2d 300 (6th Cir. 1988) (“If a reversal is mandated whenever counsel (even retained) is absent from the courtroom for any significant period, we make such an escape a sure ticket to a new trial. In multi-defendant cases, judges will be required to keep a continual head count ... lest cagey counsel be able to invoke this new rule.”). After the judge, jury, prosecutors, defense attorneys, and others have spent months in a complex trial and verdicts of conviction have been returned, none of it will mean anything for any defendant whose attorney can show that he was absent or dozed off during any of the testimony from any of the many witnesses against his client. That will be true even if the attorney missed only a few of the thousands of questions and answers that directly or indirectly inculpated his client during the long trial. It will not matter, as the [panel] majority insists it does not matter in this case, whether the inculpatory testimony that the attorney missed was repeated in his (conscious) presence. And it will not matter in the least why the attorney was absent or whether the judge noticed the absence. That is the rule the [panel] majority adopts.
United States v. Roy, 761 F.3d 1285, 1323 (11th Cir.) (Ed Carnes, C.J., dissenting), reh’g en banc granted, opinion vacated, 580 Fed.Appx. 715 (11th Cir. 2014) (citation reformatted).
Of course, even if a holding in favor of Roy could somehow be limited to single-defendant trials, handing out automatic reversals anytime defense counsel misses even a question or two still would not be cost-free. And the cost could be significant, as the case of Manuel Noriega shows. He was the sole defendant in his trial, which lasted for seven months. See United States v. Noriega, 117 F.3d 1206, 1209 (11th Cir. *1160 1997); Boyd M. Johnson, III, Note, Executive Order 12,333: The Permissibility of an American Assassination of a Foreign Leader, 25 Cornell Int’l L.J. 401, 425 n.157 (1992) (stating that trial lasted for seven months); Noriega Now Alone as Defendant, Chi. Trib., Sept. 5,1991, 1991 WLNA 3826740. After hearing evidence for seven months, the jury returned a verdict convicting him of eight counts of racketeering, manufacturing and distributing cocaine, and traveling in foreign commerce to promote an unlawful enterprise. See Noriega, 117 F.3d at 1209 n.1, 1210. The position of Roy and' the dissent is that if it were later shown that Noriega’s counsel had been out of the courtroom for seven minutes, or even half a minute, during those seven months of trial and had missed any incul-patory testimony at all, even if that testimony was repeated after counsel returned, the verdict would have to be set aside and the seven months of trial repeated with a new jury, even if the government could show beyond any reasonable doubt that counsel’s brief absence was harmless.
Unable to deal with the force of this single-defendant example on its position, the dissent attempts to recast it as a “fearful[ ] query.” Dissenting Op. at 1245. The point of the example is not that Manuel Noriega is a particularly bad character as criminal defendants go. Nor is the point that if the defendant is a really bad actor (such as someone like Roy who sexually molests a minor) we should not do what the Constitution requires. Of course we should do what the Constitution requires, but the question is what does it require and not require. The Noriega example illustrates that if the Constitution required what the dissent insists it does, it would lead to ludicrous results such as repeating a seven-month trial merely because counsel for a sole defendant was out of the courtroom for one-half minute, even though the only testimony taken while he was out was presented again after he returned. The Constitution does not require such results, but the dissent’s position would.
C. The Absence for a Substantial Portion of the Trial Exception
Many of the problems encountered in determining whether to apply a presumption of prejudice to a defense counsel’s absence from trial arise because courts try to cram all absence-of-counsel situations into Cronic’s Procrustean bed or, to vary the metaphor, fail to heed Cardozo’s warning about “the repression of a formula, the tyranny of tags and tickets.” Benjamin N. Cardozo, Mr. Justice Holmes, 44 Harv. L. Rev. 682, 688 (1931). The formula capable of impeding thought in this area is the critical stage one, and the tag or ticket slapped on the result is the Cronic label. They are useful (and obligatory) where appropriate to the factual situation, but they are problematic or worse if used where they do not apply. The law does not countenance, much less require, absurdities. And it is absurd to say that every absence of counsel during a critical stage, however momentary and whatever the circumstances, requires that a presumption of prejudice be applied. It is also absurd to say that the only absences that justify a presumption of prejudice are those that extend throughout an entire critical stage, such as a trial. We don’t have to choose either extreme on the spectrum.
When it comes to the absence of counsel from some of a trial, the rule is not “any is all,” nor is it “all or nothing.” The Supreme Court has never held that any absence at all of counsel from trial warrants a presumption of prejudice no matter what, and it has never held that only if counsel is absent throughout the entire trial should prejudice be presumed. Some of our sister circuits have avoided either extreme and the absurdities they lead to by recognizing, *1161 at least implicitly, that the Cronic critical stage standard is not the exclusive formula for determining whether to presume prejudice from the absence of counsel. They have supplemented the critical stage standard with a substantial portion of the trial standard. Under that standard, even if counsel is not absent throughout an entire critical stage, prejudice should be presumed if he is absent for a substantial portion of the trial.
1. The Substantial Portion Exception and the Cases from Which It Arose
The substantial portion exception has arisen out of cases in which defense counsel fell asleep during the trial. Courts have recognized that, for Sixth Amendment presumption of prejudice purposes, an attorney who is not consciously present at trial because he is asleep is equivalent to an attorney who is not physically present because he is outside the courtroom. See Burdine, 262 F.3d at 349 (“Unconscious counsel equates to no counsel at all.”); United States v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987) (“[S]leeping counsel is tantamount to no counsel at all.... ”); Javor v. United States, 724 F.2d 831, 834 (9th Cir. 1984) (“[U]nconscious or sleeping counsel is equivalent to no counsel at all.”). None of the circuits has concluded that counsel dozing off momentarily or sleeping through a few questions and answers is enough to presume prejudice instead of permitting the government to show beyond a reasonable doubt that the lapse was harmless.
Four of the five circuits that have addressed the issue presume prejudice if counsel slept through a substantial portion of the trial. See United States v. Ragin, 820 F.3d 609, 619 (4th Cir. 2016) (“We agree with other circuits and hold that a defendant’s Sixth Amendment right to counsel is violated when that defendant’s counsel is asleep during a substantial portion of the defendant’s trial [and that a presumption of prejudice is required].”); Muniz v. Smith, 647 F.3d 619, 623 (6th Cir. 2011) (joining the Ninth, Fifth, and Second Circuits that “have held that the denial of counsel with presumed prejudice only occurs once counsel sleeps through a ‘substantial portion of defendant’s trial’ ”) (brackets omitted); Burdine v. Johnson, 262 F.3d 336, 348-49 (5th Cir. 2001) (en banc) (finding that “defense counsel slept during substantial portions” of the trial and in those circumstances “prejudice must be presumed”); Javor v. United States, 724 F.2d 831, 834-35 (9th Cir. 1984) (“When a defendant’s attorney is asleep during a substantial portion of his trial, the defendant has not received the legal assistance necessary [and prejudice must be presumed].”).
The other one of the five circuits to address the sleeping lawyer situation, the Second Circuit, did so in Tippins v.Walker, 77 F.3d 682, 685-87 (2d Cir. 1996). There the court declined to use the “substantial portion” standard because it found the word “substantial” to be “unhelpful” in determining when prejudice must be presumed in a sleeping lawyer situation. Yet, in its place the court adopted the closely analogous standard of “repeatedly unconscious” or “repeated and prolonged lapses” in consciousness. Id. at 687, 689. Whether application of a presumption of prejudice turns on counsel having slept during a substantial portion of the trial (as the Fourth, Fifth, Sixth, and Ninth Circuits phrase it) or on his having slept repeatedly for prolonged periods of time (as the Second Circuit phrases it), all five circuits to address the matter agree that more than a short absence of consciousness due to sleep during trial is required for prejudice to be presumed.
But what is a “substantial portion” of the trial for purposes of this standard? The Fourth Circuit offered this guidance:
*1162 While we conclude that the manner in which [trial counsel] slept in the instant case was substantial, we decline to define this term for all cases. "Whether a lawyer slept for a substantial portion of the trial should be determined on a case-by-case basis, considering, but not limited to, the length of time counsel slept, the proportion of the trial missed, and the significance of the portion counsel slept through. At the same time, however, while we decline to dictate precise parameters for what must necessarily be a case-by-case assessment, we caution district courts that the scope of our holding today should not be limited to only the most egregious instances of attorney slumber.
Ragin, 820 F.3d at 622 n.11 (emphasis added). The three non-exclusive factors listed — length of time missed, proportion of trial missed, and significance of the missed portion — are all important.
We add to the Fourth Circuit’s nonexclusive list of factors for determining whether what counsel missed was a substantial portion of the trial another factor at least as important as those it set out: whether the specific part of the trial that counsel missed is known or can be determined. Do we know what testimony he did not hear because he was asleep or outside the courtroom? This factor should bear heavily on whether to presume prejudice or give the government an opportunity to show beyond a reasonable doubt the lack of it, because in determining if the defense was prejudiced because of something counsel missed, it helps a lot to know what counsel missed. The Ninth Circuit in Javor noted the difficulty in determining prejudice with “a record which lacked any indication of when Javor’s attorney was alert and when he was sleeping.” 724 F.2d at 833; see also Tippins, 77 F.3d at 686 (“[I]f counsel sleeps, the ordinary analytical tools for identifying prejudice are unavailable. The errors and lost opportunities may not be visible in the record, and the reviewing court ... may be forced to engage in unguided speculation.”) (quotation marks omitted). To inform our analysis of what it means to be absent for a substantial portion of the trial, we turn to the facts in each of the sleeping lawyer cases to see how substantial, or how repeated and prolonged, the absence of consciousness by counsel was in the four cases where prejudice was presumed and in the one where it was not.[15]
2. Application by Other Circuits of the Substantial Portion of Trial Standard
We begin with the decision that gave birth to the substantial portion test. In the *1163 Ninth Circuit’s Javor decision, defense counsel “was sleeping while testimony pertaining to the petitioner was being' adduced.” 724 F.2d at 834. He told a codefen-dant’s counsel that “he had missed some of the testimony and asked ... if he had missed anything related to the petitioner.” Id. (ellipses in original). Not only that but “[t]he trial judge noted that Javor’s attorney was often ‘dozing’ and that other attorneys ‘nudged’ and ‘kicked’ him to wake him up.” Id. Those facts convinced the Ninth Circuit that counsel had been consciously absent during a substantial portion of the trial and prejudice should be presumed.
We have already discussed the Fifth Circuit’s decision in the Burdine case. See supra at 1154. For present purposes, it is useful to recall that in Burdine defense counsel slept repeatedly through “a not insubstantial portion of the 12 hour and 51 minute trial,” including during the prosecutor’s presentation of evidence against the defendant. 262 F.3d at 338-40, 348-49. A juror testified to having seen counsel asleep as many as 10 different times during the trial and for “a good probably at least 10 minutes” on one occasion, and testimony showed that there were “lots of incidents” of him sleeping while the prosecution was questioning witnesses. Id. at 339. The deputy clerk, who was in the best position to observe counsel, testified that he “was asleep for long periods of time during the questioning of witnesses.” Id. The state collateral trial court found that “defense counsel repeatedly dozed and/or actually slept during substantial portions of Burdine’s capital murder trial so that defense counsel was, in effect, absent.” Id. at 340 (brackets omitted). On those facts the Fifth Circuit held that prejudice should be presumed under the substantial portion standard but was careful to limit its holding to “the egregious facts” in that case. Id. at 349.
In Ragin trial counsel did not dispute that he had slept. 820 F.3d at 622. In fact, “counsel was asleep for much of Ragin’s trial.” Id. at 613. Throughout the 15-day trial, he slept “frequently ... almost every day ... morning and evening for 30 minutes at least at a time.” Id. at 621 (quotation marks and brackets omitted) (ellipses in original). Some of the time he was seen “resting his head” as he slept. Id. Finding “it impossible not to conclude that [he] slept and therefore was not functioning as a lawyer during a substantial portion of the trial,” the Fourth Circuit presumed prejudice. Id. at 622-23.
In the Tippins case, the Second Circuit found that “counsel was unconscious for numerous extended periods of time during which the defendant’s interests were at stake.” 77 F.3d at 685. He slept every day of the 12-day trial; he slept during “two-thirds of the testimony” of the confidential informant who was a “critical” prosecution witness; and he slept through “the majority” of the “damaging” testimony of a co-defendant. Id. at 687-90 (brackets omitted). The court reporter described counsel’s sleeping as “a continuous thing.” Id. at 688. More than one witness actually heard him snoring. Id. at 688-89. It was on those extreme facts that the Second Circuit found that defense counsel had not merely been inattentive but had suffered repeated and prolonged lapses of consciousness because he slept through much of the trial, justifying a presumption of prejudice. Id. at 687-90.
The attorney in the Muniz case “was asleep for an undetermined portion of a single cross-examination,” although it was the cross-examination of his own client. 647 F.3d at 624. The “total cross-examination was fairly short, spanning only 26 pages of trial transcript” and “he objected near the end of [it],” leading the Sixth Circuit to conclude that “Muniz’s lawyer *1164 therefore must have only been asleep for a brief period.” Id. Distinguishing cases like Tippins where counsel had slept for substantial portions of the trial, the court held that a presumption of prejudice should not apply in that case. Id.
3. The Relationship of the Cronic Exception and the Substantial Portion of Trial Exception
When counsel is not consciously present — either because he is asleep or physically absent — throughout an entire discrete, critical stage of a criminal proceeding, Cronic requires that prejudice be presumed. And as we have already explained, see supra at 1145-46, a critical stage is either a self-contained proceeding or a discrete and separately identifiable piece of one. See, e.g., Iowa v. Tovar, 541 U.S. 77, 87, 124 S.Ct. 1379, 1387, 158 L.Ed.2d 209 (2004) (plea hearing); Gardner, 430 U.S. at 358, 97 S.Ct. at 1204-05 (sentence hearing); Gilbert, 388 U.S. at 272-74, 87 S.Ct. at 1956-57 (post-indictment pretrial lineup); White, 373 U.S. at 59-60, 83 S.Ct. at 1051 (preliminary hearing); Hamilton, 368 U.S. at 54, 82 S.Ct. at 158-59 (arraignment). We believe that where counsel’s absence does not extend throughout an entire critical stage, such as the trial or all of the taking of testimony, the more appropriate test or standard is whether counsel missed a substantial portion of it. The sleeping lawyer cases illustrate the use of that standard, but it is also appropriate for physical absences during part of a trial. As at least three circuits have noted, for Sixth Amendment presumption of prejudicé purposes cases involving sleeping and physically absent counsel should be subject to the same standard for determining whether to presume prejudice or allow the government an opportunity to show the lack of it beyond a reasonable doubt. See Burdine, 262 F.3d at 349; DiTommaso, 817 F.2d at 216; Javor, 724 F.2d at 834. We agree.
Our conclusion that the absence of an attorney from the courtroom for an insubstantial portion of the trial does not justify a presumption of prejudice under the Cronic critical stage exception to the harmless error rule and that the substantial portion of trial standard is the appropriate one for those circumstances is not inconsistent with any Supreme Court decision. The Court has never held that the testimony of one or some witnesses is a critical stage for Cronic purposes, much less that a small part of the testimony of a single witness is. And the Court has never held that prejudice should be presumed if defense counsel is absent from the courtroom for an insubstantial portion of trial or that it should not be presumed if counsel is absent for a substantial portion of the trial. The Supreme Court has never addressed this issue.
The substantial portion of trial standard, and the four non-exclusive factors we have discussed for applying it, not only explains the sleeping lawyer decisions of our sister circuits, which explicitly apply that standard, it also explains the Russell and Olden physical absence decisions that Roy relies on. In Russell, counsel was absent for two days of his client’s trial for conspiracy to commit drug trafficking and money laundering, missing the testimony of at least 18 prosecution witnesses and the admission of “numerous exhibits,” all of which went to prove guilt. See 205 F.3d at 769-70, 772. Obviously, counsel was absent for a substantial portion of the trial. The Olden case involved counsel’s “excessive absence” during trial, including two days during which he missed incriminating testimony of prosecution witnesses. See 224 F.3d at 566, 568-69. Again, that was obviously a substantial portion of the trial. The Green case involved an absence of at least *1165 an hour and forty minutes during which a key government witness testified, and any determination of prejudice in that case would be complicated by the fact that exactly what other parts of the trial counsel missed could not be determined. 809 F.2d at 1259-60, 1259 n.1. That is the fourth factor of the substantial portion standard or test, and it weighs in favor of the court’s decision to presume prejudice in Green.
We recognize that many of the decisions about partial absences succumb to the tyranny of tags and tickets by putting the “Cronic error” or “critical stage” label on their analysis and conclusions instead of, or in addition to, speaking in terms of whether the attorney was out for a substantial portion of the trial. See, e.g., Ragin, 820 F.3d at 619-20, Burdine, 262 F.3d at 338, 341. Their analysis, however, focuses on whether counsel was mentally or physically absent for a substantial portion of the trial. As the Fourth Circuit has suggested, the substantial portion determination should be made on a case-by-case basis considering, among other factors, the length of time counsel was out, the proportion of the trial missed, and the significance of what he missed. Ragin, 820 F.3d at 622 n.11.
An additional factor to be considered is whether the reviewing court can determine when counsel was out and what he missed. While there is usually no way to tell exactly when a dozing lawyer was “out” during the trial, see, e.g., Burdine, 262 F.3d at 348 n.7, determining when and for how long counsel was physically absent is usually less difficult. The Eighth Circuit underscored that point in its Sweeney decision. See 766 F.3d at 861 (“The fact that the record demonstrates precisely what [Sweeney’s counsel] missed while he was out of the room — and the fact that his absence was so brief — allows the Court to confidently assess whether Sweeney was harmed by [his counsel’s] absence.”) (quoting with approval the district court) (alterations in original); see also Raid, 502 F.3d at 44-47 (refusing to presume prejudice where court knew exactly what counsel had missed when he returned to courtroom 20 minutes late after lunch). This case shows that as well. We know exactly when Roy’s counsel was absent and precisely which questions were asked and answers given during that time. See supra at 1136-37.
A final consideration that courts should keep in mind in applying the substantial portion of the trial standard is that we are not talking about whether to presume that there was no prejudice or harm. We are talking about whether to presume that there was prejudice or harm, which would deny the government the opportunity to persuade the court beyond a reasonable doubt that in light of all of the evidence in the case there was no prejudice or harm. Even without a presumption of prejudice the defendant will be granted a new trial where there is any reasonable doubt about his having been prejudiced or harmed.[16]
4. Application of the Substantial Portion Standard to the Facts of this Case
As we have pointed out far more than once, Roy’s counsel missed only seven minutes of a trial that lasted 1,884 minutes or *1166 31.4 hours (not counting recesses and jury-deliberations), which is less than one-half of one percent of trial time. He missed only 18 answers that were given by one of the government’s 13 witnesses who collectively gave a total of approximately 2,745 answers, meaning he missed less than one percent of the total. And we know exactly which questions and answers he missed. His physical absence was far more momentary and far less substantial than any in the five cases that our sister circuits have decided under the substantial portion standard. We have no trouble concluding that Roy’s counsel did not miss a substantial portion of the trial.
No presumption of prejudice is due under that exception, just as none is due under the Cronic critical stage exception. That prejudice is not to be presumed does not mean that there was no constitutional violation, and it does not mean there is no possibility of the convictions being reversed. It means, instead, that the harmless error rule applies, and his convictions should be reversed unless the government has carried its burden of showing the error was harmless beyond a reasonable doubt. Which it has. See infra Part VI.
D. Roy’s Speculation Arguments and the Breadth of the Harmless Error Rule
Roy argues that the harmless error rule cannot apply because we cannot be certain whether a brief absence of counsel during trial affected the verdict and courts should never speculate about such things. The most that can be said for that argument is that it is couched in good grammar and sensible syntax, but it is unpinned from precedent and loose from logic.
To begin with, almost every determination about whether a deficiency, error, or defect in counsel’s representation or some other aspect of the trial was prejudicial or harmless requires “speculation” in the sense that Roy is using the word. He is using that word to mean “deciding without knowing for certain.” Consider what the Supreme Court said about that in the Sears capital case. Defense counsel had found and presented some mitigating circumstance evidence but not all that he could and should have. See Sears v. Upton, 561 U.S. 945, 945-46, 130 S.Ct. 3259, 3261, 177 L.Ed.2d 1025 (2010). Some of the mitigating circumstance evidence that counsel did not find and present might have had an adverse effect or it might have had a net beneficial effect for the defense. See id. at 947-51, 130 S.Ct. at 3261-64. The state collateral court rejected Sears’ ineffective assistance claim because he had failed to prove prejudice. Id. at 952, 130 S.Ct. at 3264-65.
In explaining its holding in that case, the state court said that “it is impossible to know what effect a different mitigation theory would have had on the jury.” Id. at 952, 130 S.Ct. at 3264 (alterations omitted). Its thinking was that a court could only speculate about prejudice and speculation was not good enough so why try. See id. at 946, 130 S.Ct. at 3261. Reversing the state court, the Supreme Court emphatically rejected the notion that it requires too much speculation to determine whether different evidence or a different theory would have affected a jury’s decision in a given case. The Court explained that assessing whether the prejudice prong of an ineffective assistance of counsel claim has been met, whether there is a reasonable probability of a different result but for the error, “will necessarily require a court to ‘speculate’ ” about the effect of the deficiency or error. Id. at 956, 130 S.Ct. at 3266. But speculation in that broad sense, which equates with the lack of certainty, is not impermissible; it is inevitable, the Court noted. See id.
*1167 It would be nice if there were a software program into which a trial record could be scanned, an error could be input into the program, and the result would pop up on screen as: “prejudicial” or “harmless.” That is not, however, the nature of the enterprise. Prejudice inquiries require the exercise of a court’s best judgment. All prejudice or harmlessness determinations require some measure of estimation or of what the Supreme Court in Sears described as permissible “speculation.” Every work day all across the country courts decide cases by determining, to the best of their abilities, whether something that defense counsel did, or did not do, prejudiced or harmed the defendant by adversely affecting the result of the trial. If that is speculation, then speculation is rampant in the nation’s courts.
We will not do what the Supreme Court reversed the state court for doing in Sears and what Roy would have us do in this case, which is throw up our hands and decline to make a determination about prejudice and harmlessness. See also Sanders, 556 U.S. at 407, 129 S.Ct. at 1704-05 (“We have previously warned against courts’ determining whether an error is harmless through the use of mandatory presumptions and rigid rules rather than case-specific application of judgment, based upon examination of the record.”). Certainty is illusory in human affairs. If certainty about the lack of an error’s effect were required, virtually every error would mandate reversal, and harmless error would be an endangered if not extinct doctrine. Yet the harmless error doctrine is alive and well. It serves vital interests and promotes public respect for the criminal process. See Neder, 527 U.S. at 18, 119 S.Ct. at 1838; Agurs, 427 U.S. at 108, 96 S.Ct. at 2400; see also Johnson, 520 U.S. at 470, 117 S.Ct. at 1550.
As the Supreme Court has repeatedly held, the vast majority of constitutional errors that occur at a criminal trial, including Sixth Amendment violations, should be examined for prejudicial effect and those errors do not require reversal if they are harmless. And as we have mentioned, in Fulminante the Court listed 16 of its decisions establishing this point, a list which refutes Roy’s position 16 times over:
Since this Court’s landmark decision in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824 [17 L.Ed.2d 705] (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless. See, e.g., Clemons v. Mississippi, 494 U.S. 738, 752-54, 110 S.Ct. 1441, 1450-51 [108 L.Ed.2d 725] (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792 [100 L.Ed.2d 284] (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); Carella v. California, 491 U.S. 263, 266, 109 S.Ct. 2419, 2421 [105 L.Ed.2d 218] (1989) (jury instruction containing an erroneous conclusive presumption); Pope v. Illinois, 481 U.S. 497, 501-04, 107 S.Ct. 1918, 1921-23 [95 L.Ed.2d 439] (1987) (jury instruction misstating an element of the offense); Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101 [92 L.Ed.2d 460] (1986) (jury instruction containing an erroneous rebut-table presumption); Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147 [90 L.Ed.2d 636] (1986) (erroneous exclusion of defendant’s testimony regarding the circumstances of his confession); Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431 [89 L.Ed.2d 674] (1986) (restriction on a defendant’s right to cross-examine a witness for bias in viola *1168 tion of the Sixth Amendment Confrontation Clause); Rushen v. Spain, 464 U.S. 114, 115-18 & n.2, 104 S.Ct. 453, 454-55 & n.2 [78 L.Ed.2d 267] (1983) (denial of a defendant’s right to be present at trial); United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974 [76 L.Ed.2d 96] (1983) .(improper comment on defendant’s silence at trial, in violation of the Fifth Amendment Self-Incrimination Clause); Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049 [72 L.Ed.2d 367] (1982) (statute ' improperly forbidding trial court’s giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); Kentucky v. Whorton, 441 U.S. 786, 99 S.Ct. 2088 [60 L.Ed.2d 640] (1979) (failure to instruct the jury on the presumption of innocence); Moore v. Illinois, 434 U.S. 220, 232, 98 S.Ct. 458, 466 [54 L.Ed.2d 424] (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 1570-71 [36 L.Ed.2d 208] (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174 [33 L.Ed.2d 1] (1972) (confession obtained in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199 [12 L.Ed.2d 246] (1964)); Chambers v. Maroney, 399 U.S. 42, 52-53, 90 S.Ct. 1975, 1981-82 [26 L.Ed.2d 419] (1970) (admission of evidence obtained in violation of the Fourth Amendment); Coleman v. Alabama, 399 U.S. 1, 10-11, 90 S.Ct. 1999, 2003-04 [26 L.Ed.2d 387] (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Confrontation Clause).
499 U.S. at 306-07, 111 S.Ct. at 1263 (citations reformatted). There is no good reason why those 16 types of constitutional violations, some of which involve the right to counsel, are subject to review for harmless error but the violation in this case should not be. No less “speculation” is required to determine whether any of those errors were prejudicial or harmless than is required to make the same determination about counsel’s momentary absence in this case.
This point is evident from the actual holding in Fulminante itself. The issue was whether erroneous admission of a coerced confession in violation of the Due Process Clause is reviewable for harmless error or should be presumed prejudicial. Id at 284-85, 111 S.Ct. at 1251. The Supreme Court recognized that “confessions have [a] profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.” Id. at 296, 111 S.Ct. at 1257 (quotation marks omitted). Yet the Court still held that the constitutional error of admitting a coerced confession is subject to harmless error review. Id. at 303, 111 S.Ct. at 1261. If the erroneous admission of a confession that may have had a “profound impact on the jury” does not warrant a presumption of prejudice, neither does the erroneous admission of inculpatory evidence presented during counsel’s brief absence from the courtroom. See Satterwhite, 486 U.S. at 257, 108 S.Ct. at 1798 (observing that harmless error review is permitted “where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial”).
E. The Lost Objections, Hampered Cross-Examination, and Lost Impeachment Arguments
1. Lost Opportunity to Object to Testimony
Roy contends that because of counsel’s seven-minute absence from the courtroom he lost the opportunity to object to the questions that the prosecutor asked while *1169 he was out of the courtroom, and that we cannot know if counsel would have objected had he been present, so prejudice must be presumed. The simple answer to that contention is that counsel did not lose the opportunity to object to those questions. He had the opportunity to object to them when he first heard the same questions asked again immediately after he returned to the courtroom. Because counsel did not object to any of those questions when he had that opportunity to object, we know that he had no objection he wanted to make to them. That proves there was no prejudice from a lost opportunity to object, if proof is required.
The second independently adequate reason we reject Roy’s contention is that the most a defendant suffers from a lost opportunity to object is that an objection that should have been made was not made. That loss does not require a presumption of prejudice because courts are fully capable of deciding, and regularly do decide, if an attorney’s failure to object to testimony when he might have objected is prejudicial or is harmless. There are plenty of reported decisions doing just that and no decisions that we could find holding that courts are unable to measure the prejudicial effect of an objection that was not made. See, e.g., Cox v. McNeil, 638 F.3d 1356, 1364 (11th Cir. 2011) (determining whether counsel’s failure to object to testimony of expert witness for the prosecution was prejudicial); Dorsey v. Chapman, 262 F.3d 1181, 1186 (11th Cir. 2001) (same); Hays v. Alabama, 85 F.3d 1492, 1495-96 (11th Cir. 1996) (determining whether counsel’s failure to object to the introduction of uncharged criminal offenses was prejudicial); Jones v. Dugger, 928 F.2d 1020, 1023, 1029 (11th Cir. 1991) (determining whether counsel’s failure to object to testimony of prosecution witness was prejudicial); Howard v. Davis, 815 F.2d 1429, 1432 (11th Cir. 1987) (determining whether counsel’s failure to object to psychiatrist’s testimony was prejudicial); Cape v. Francis, 741 F.2d 1287, 1300 (11th Cir. 1984) (same).
As those and many other decisions show, there is nothing unusual — or unusually difficult — about determining whether a failure to object, or a lost opportunity to object, to testimony was prejudicial or harmless. In this case the inquiry is particularly easy because the same questions that were asked in counsel’s absence were repeated in his presence after he returned to the courtroom, and he made not one objection to any of them.
Faced with all of those decisions in which courts have gauged the prejudicial effect, if any, of an attorney’s failure to object to testimony, the dissent laments that: “I am not so sure that a lost opportunity to object is the same thing as the failure to object — or so easily quantifiable. It seems to me that a lost opportunity to object is an altogether different problem, one that requires speculation to resolve.” Dissenting Op. at 1235 n.5. But the dissent never tells us why gauging prejudice from a lost opportunity to object is “an altogether different problem” from gauging prejudice from an objection that counsel had an opportunity to make but did not. The dissent gives no explanation why the difficulty in determining if the absence of an objection was prejudicial varies depending on the reason there was no objection. No explanation is given because none exists.
The harm, if any, caused by the absence of an objection is the same regardless of whether the reason there was no objection is that counsel was absent, or he was distracted, or he was just negligent. Regardless of the reason there was no objection, the jury hears the same testimony and the effect of that testimony is the same. When it comes to an objection that was not made, prejudice is prejudice and harmlessness is harmlessness. The ability of courts to gauge the effect of an objec *1170 tion not being made is the same regardless of why it was not made. Identical cases, involving identical evidence that was admitted without objection, should be treated the same regardless of the reason there was no objection, and where the lack of an objection was harmless the judgment should not be set aside.[17]
2. Hampered Cross-Examination and Lost Opportunity to Assert Defenses
Roy also contends that we must presume prejudice because his counsel’s absence during seven minutes of Deputy Longson’s testimony may have hampered counsel’s cross-examination, or may have caused counsel not to assert some defense, or may have prevented counsel from presenting some evidence to rebut the testimony that came in during those seven minutes. But courts regularly assess whether a defendant has suffered prejudice from foregone cross-examination, foregone defenses, and foregone evidence. See, e.g., Hinton v. Alabama, 571 U.S. -, 134 S.Ct. 1081, 1088-90, 188 L.Ed.2d 1 (2014) (remanding for the district court to determine whether petitioner was prejudiced by counsel’s failure to request additional funding in order to hire an adequate expert); Harrington v. Richter, 562 U.S. 86, 110-12, 131 S.Ct. 770, 790-92, 178 L.Ed.2d 624 (2011) (determining whether petitioner was prejudiced by counsel’s failure to present expert testimony on serology, pathology, and blood spatter patterns); Roberts v. Comm’r, Ala. Dep’t of Corr., 677 F.3d 1086, 1090-94 (11th Cir. 2012) (determining whether defendant suffered prejudice from his attorney’s failure to raise insanity defense); Pietri v. Fla. Dep’t of Corr., 641 F.3d 1276, 1280-84 (11th Cir. 2011) (determining whether defendant suffered prejudice from his attorneys’ failure to raise voluntary intoxication defense); Jackson v. Herring, 42 F.3d 1350, 1362, 1368-69 (11th Cir. 1995) (determining whether petitioner was prejudiced by counsel’s failure to investigate and present mitigating evidence at sentencing).
This kind of prejudice inquiry is old hat for courts. We do it often, without protesting that it is too difficult or too much trouble. It is part of our judicial duty. And again, it is simple to do in this case because the same questions counsel missed were repeated after he came back into the courtroom. We know what objections he wanted to make to those questions from the objections he made to them when they were asked in his presence: none.
3. Lost Opportunity to Impeach
Roy also complains that because of counsel’s brief absence from the courtroom he did not hear Deputy Longson mistakenly testify that the images of L.B. were taken on March 10, 2005 instead of March 11, 2006. As we point out elsewhere, the difference is immaterial because L.B. was a minor (under 18 years of age) on both dates (she was 15 years old on the earlier date and 16 years old on the later date). See supra at 1137 n.1; infra at 1181-83. *1171 And there was a mountain.of other evidence proving beyond a reasonable doubt Roy’s guilt of the charges to which those images of L.B. related. See infra at 1182-88.
Roy does not dispute that the victim was a minor regardless of which date for that particular file is used, but instead argues that if counsel had been present and had heard Longson’s slip up about the date, he could have used that mistake in an attempt to impeach Longson’s testimony; and because he lost the opportunity to impeach, prejudice should be irrebuttably presumed. The problem for Roy is that courts are fully capable of deciding, and regularly do decide, if an attorney’s failure to impeach a prosecution witness with prior inconsistent testimony or other evidence is prejudicial or harmless. There are legions of decisions doing just that. See, e.g., Strickler v. Greene, 527 U.S. 263, 289-96, 119 S.Ct. 1936, 1952-55, 144 L.Ed.2d 286 (1999) (determining that petitioner was not prejudiced by loss of opportunity to use withheld documents to impeach a key prosecution witness); Barwick v. Sec’y, Fla. Dep’t of Corr., 794 F.3d 1239, 1251-53 (11th Cir. 2015) (denying habeas relief in a capital case because the petitioner had not shown prejudice from his counsel’s failure to use a prosecution witness’ prior inconsistent testimony in another proceeding to impeach her); Fugate v. Head, 261 F.3d 1206, 1208, 1220 (11th Cir. 2001) (determining that petitioner had not shown prejudice from his attorney’s failure to impeach the testimony of the sole eyewitness to the murder with his prior inconsistent statement to police); Nixon v. Newsome, 888 F.2d 112, 116-17 (11th Cir. 1989) (determining, after “[c]onsidering all the circumstances,” that petitioner had been prejudiced by his counsel’s failure to impeach the key prosecution witness with her prior inconsistent testimony); Jones v. Butler, 778 F.3d 575, 584-86 (7th Cir. 2015) (denying habeas relief on a claim involving counsel’s failure to impeach the testimony of a prosecution witness because “[w]e cannot say that [the witness’] testimony would have altered the outcome even if the impeachment had been perfected”); United States v. Travillion, 759 F.3d 281, 290-93, 299 (3d Cir. 2014) (denying relief on a claim involving counsel’s failure to use a prosecution witness’ contradictory statements from an earlier trial to impeach him because the collective evidence against the petitioner showed he was not prejudiced by that failure, and observing that “[t]he right to a fair trial does not translate into the right to a perfect trial”); United States v. Orr, 636 F.3d 944, 951-54 (8th Cir. 2011) (denying relief on a claim involving counsel’s failure to impeach a prosecution witness with her cooperation agreement and her prior inconsistent statements because, even though counsel could have “eroded [her] credibility in the jury’s eyes by impeaching [her],” in view o'f the other evidence of guilt “there is not a reasonable probability that [the] impeachment would have manufactured reasonable doubt in the jurors’ minds”); Moore v. Marr, 254 F.3d 1235, 1237-38, 1240-41 (10th Cir. 2001) (denying habeas relief on claim involving “counsel’s failure to impeach a key prosecution witness” because even if “[the witness] had been impeached we cannot conclude that the outcome would have been different”).
All of those decisions, and more like them, foreclose Roy’s argument that prejudice should be presumed on the theory that courts are not capable of determining whether the failure to use a particular piece of evidence to impeach was prejudicial or instead was harmless. Courts can and do make that determination if a failure to impeach resulted from counsel error. Yet the dissent worries that courts are somehow not capable of making exactly the same determination if the failure to impeach occurred because counsel was un *1172 aware of the testimony or other evidence that could have been used to impeach. See Dissenting Op. at 1235 & n.5 (“Lost opportunities matter.... And further, here, it was a lost opportunity to impeach — the effects of which could have pervaded the witness’s entire testimony.”).
The dissent never explains why the reason that impeachment did not occur matters in gauging the prejudicial effect, if any, of the unused impeachment. What we said earlier about why a failure to object does not affect a court’s ability to gauge prejudice applies with equal force to a failure to impeach. Because the impeachment evidence the jury does not hear is the same regardless of the reason it does not hear that evidence, the effect of the jury not hearing that evidence is the same. It follows that the court’s ability to gauge the effect of the jury not hearing impeachment evidence is the same as well. What matters is the prejudicial or harmless effect of the lack of impeachment, and all of the decisions we have just cited establish that courts are fully capable of gauging that effect and regularly do so.
Faced with all of those decisions, the dissent simply disagrees, insisting that “[l]ost opportunities matter,” and are all that matter, when it comes to a failure to impeach, and if impeachment does not occur because of a lost opportunity — as distinguished from an opportunity that counsel had but failed to take advantage of — ■ prejudice, cannot be measured and must be presumed. See Dissenting Op. at 1233, 1234-37. The distinction the dissent would have us make has no logical basis, which coincides with the fact that it is foreclosed by at least three decades of binding precedent.
The Supreme Court and this Court have repeatedly held that when the government suppresses impeachment evidence depriving the defense of the opportunity to impeach a prosecution witness, prejudice is not to be presumed but must be shown by the defendant. See, e.g., United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). There is a different standard when the government deliberately uses, or fails to correct, perjury that deprives the defendant of the opportunity to use impeachment evidence, but even then there is no automatic reversal and the harmless error rule applies. See Agurs, 427 U.S. at 103-04, 96 S.Ct. at 2397.
In the Bagley case the government had given the defense affidavits from its “two principal witnesses” attesting that they had not been given any rewards or promises of reward.[18] M. at 670, 105 S.Ct. at 3377. Even though the defense asked for information about any deals, promises, or inducements, the government did not disclose that it had signed a “Contract for Purchase of Information and Payment of Lump Sum Therefor” with the two witnesses. Id. at 669-71, 105 S.Ct. at 3377-78. It had promised to pay the two witnesses as “vendors” an amount described in the contract as “a sum commensurate with services and information provided,” and they expected to be paid and were paid. Id. at 671-72, 105 S.Ct. at 3377-78. The government’s failure to disclose that evidence to the defense deprived it of the opportunity to impeach the two govern *1173 ment witnesses by showing their bias or interest. Id. at 676, 105 S.Ct. at 3380.
The Ninth Circuit set aside the conviction, holding that: “the government’s failure to provide requested Brady information to Bagley so that he could effectively cross-examine two important government witnesses requires an automatic reversal.” Id. at 674, 105 S.Ct. at 3379 (quoting Bagley v. Lumpkin, 719 F.2d 1462, 1464 (9th Cir. 1983)). The Supreme Court rejected the Ninth Circuit’s automatic reversal rule and reversed its judgment. In doing so, the Court acknowledged that impeachment evidence is covered by the Brady rule because it is evidence favorable to the accused that “if disclosed and used effectively ... may make the difference between conviction and acquittal.” Id at 676, 105 S.Ct. at 3380. And the Court recognized that the “possibility of a reward gave [the two witnesses] a direct, personal stake in [Bagley’s] conviction.” Id. at 683, 105 S.Ct. at 3384. Not only that but, as the Court pointed out, “the natural effect” of the affidavits that the government did give the defense “would be misleadingly to induce defense counsel to believe that [the two witnesses] provided the information in the affidavits, and ultimately their testimony at trial recounting the same information, without any ‘inducements.’ ” Id. at 684, 105 S.Ct. at 3384.
Even with all of that in the case, the Supreme Court rejected an automatic reversal rule. It held, instead, that when the government deprives a defendant of the opportunity to impeach a witness by a misleading failure to disclose evidence that could have been used for that purpose, the conviction is to be set aside “only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” Id. at 682, 105 S.Ct: at 3383 (borrowing the Strickland prejudice standard). The requirement of prejudice, the Court explained, is “[cjonsistent with our overriding concern with the justice of the finding of guilt.” Id. at 678, 682, 105 S.Ct. at 3381, 3383 (quotation marks omitted).
The Bagley rule is still in full force and effect. Its requirement that a defendant who has been deprived by the government of an opportunity to impeach a witness against him must prove prejudice in order to obtain relief has been reiterated and applied in many decisions. See, e.g., Strickler v. Greene, 527 U.S. 263, 273-75, 289-96, 119 S.Ct. 1936, 1944-45, 1952-55, 144 L.Ed.2d 286 (1999) (holding that a defendant deprived of an opportunity to impeach an eyewitness by the government’s failure to disclose documents “that cast serious doubt” on significant portions of her testimony was not entitled to relief, because he “had not shown that there is a reasonable probability that his conviction or [death] sentence would have been different had these materials been disclosed”); Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004) (reiterating and applying, in a case involving the prosecution’s failure to disclose impeachment evidence, Bagley’s holding that an essential component of a Brady claim is that “prejudice must have ensued”) (quotation marks omitted); Gissendaner v. Seaboldt, 735 F.3d 1311, 1322 (11th Cir. 2013) (affirming the denial of habeas relief in a capital case where “[t]he state habeas court reasonably found that further impeachment of [the prosecution’s key witness] based on the undisclosed statements contained in the prosecution team’s notes would not have created a reasonable probability of a different result in either phase of the trial”); Boyd v. Comm’r, Ala. Dep’t of Corr., 697 F.3d 1320, 1334-35 (11th Cir. 2012) (affirming the denial of habeas relief in a capital case *1174 where the prosecution failed to disclose “statements of co-defendants and agreements with defense witnesses, which would have cast doubt on the prosecution’s case while bolstering [the] defense,” because of a failure “to show ‘a reasonable probability that, had the evidence • been disclosed to the defense, the result of the proceeding would have been different’ ”) (quoting Bagley, 473 U.S. at 682, 105 S.Ct. at 3388); Ponticelli v. Sec’y, Fla. Dep’t of Corr., 690 F.3d 1271, 1292-94 (11th Cir. 2012) (affirming the denial of habeas relief in a capital case because it is not “reasonably probable that a different outcome would have resulted if the government had disclosed” impeachment evidence).
There is even more precedent foreclosing the dissent’s position. The Supreme Court has not only rejected a presumption of prejudice/automatic reversal rule where the government deprives the defense of an opportunity to impeach by failing to disclose evidence, it has also rejected such a rule when the government deprives the defense of that opportunity by using perjured testimony or failing to correct what it knows is false testimony. Even in those extreme circumstances, the defendant is not entitled to have his conviction set aside if the government shows that the false testimony was harmless beyond a reasonable doubt. See Agurs, 427 U.S. at 97, 103, 96 S.Ct. at 2397 (“[T]he Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.”) (footnotes omitted); Bagley, 473 U.S. at 678-79, 105 S.Ct. at 3381-82 (clarifying or modifying the Agurs standard to mean that the use of false testimony is material and requires relief “unless failure to disclose it would be harmless beyond a reasonable doubt”) (emphasis added).
So this is where the law is on the subject of the defense being deprived of an opportunity to impeach a government witness, including a key witness: Even when the loss of the opportunity to impeach results from the government’s failure to disclose evidence, there is no automatic reversal. The conviction stands unless the defendant can show prejudice; he must show that there is a reasonable probability of a different result if the evidence had been disclosed. And even when the loss of opportunity to impeach involves the government’s deliberate use of perjured testimony or failure to correct perjured testimony, there is no automatic reversal. The conviction still stands if the government shows that the lost opportunity to impeach caused by its misconduct was harmless beyond a reasonable doubt.
Given that settled law, what sense would it make to hold, as the dissent urges, that when the defendant loses an opportunity to impeach because his attorney was briefly out of the courtroom, reversal is automatic and the harmless error rule does not apply? Why should relief be easier to obtain in those circumstances, which are not the fault of the government, than when the loss of opportunity to impeach involves the government’s deliberate use of false testimony, which is “prosecutorial misconduct and, more importantly, involves ‘a corruption of the truth-seeking function of the trial process’ ”? Bagley, 473 U.S. at 680, 105 S.Ct. at 3382 (quoting Agurs, 427 U.S. at 104, 96 S.Ct. at 2397). The answer, of course, is that it should not be easier to obtain relief when the lost opportunity to impeach does not result from serious government misconduct than when it does. The harmless error rule should, and does, apply in both circumstances.
4. The Fingerprint Hypothetical
The dissent poses the hypothetical of a homicide trial in which counsel is gone for *1175 one minute during which time a government witness testifies that the fingerprint on the murder weapon is the defendant’s. The dissent argues that “even if the testimony is repeated and subjected to cross-examination when defense counsel returns, there is no way to measure how much the initial opinion influenced the jury’s consideration of the defendant’s guilt.” Dissenting Op. at 1243. “Therein,” says the dissent, “lies the problem with applying a harmless-error analysis to an absence of counsel during the admission of inculpato-ry evidence.” Id. at 1243. No, not really. What actually lies within that hypothetical, or within variations of it, is proof that the dissent’s position is wrong and that harmless error analysis can be applied to temporary absences of counsel during the admission of inculpatory evidence.
The dissent never explains why the determination of prejudice or harmlessness from the fingerprint evidence in that hypothetical case should be different from exactly the same determination in cases involving exactly the same fingerprint evidence admitted as the result of other constitutional violations. In similar situations involving the admission of incriminating evidence brought about by different constitutional violations, the law requires that courts gauge the prejudicial or harmless impact of the evidence, and there is no reason for not doing that here. The ability of courts to determine the prejudicial or harmless effect of evidence does not depend on the nature of the error involving its admission, a point that variations of the hypothetical will demonstrate.
Let the dissent’s hypothetical be Scenario One. Scenario Two is exactly the same trial and evidence. Except in this scenario the testimony about the fingerprint on the murder weapon is inadmissible but comes into evidence anyway because defense counsel negligently fails to object even though he is present at all times. It is beyond dispute that in those circumstances reversal is not automatic but occurs only if the defendant can show a reasonable probability of a different result if counsel had objected as all reasonable attorneys would have. See Strickland, 466 U.S. at 691, 694, 104 S.Ct. at 2066, 2068; see also Bates v. Sec’y, Fla. Dep’t of Corr., 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) (holding that defense counsel’s failure to object to testimony did not warrant a new trial because there was no prejudice from admission of the testimony); Dorsey v. Chapman, 262 F.3d 1181, 1186 (11th Cir. 2001) (same). The law requires that the district court, and then we as a reviewing court, determine whether the admission of that evidence in Scenario Two, which is the same evidence as in the dissent’s hypothetical, was prejudicial. We could not, as the dissent suggests we should, simply quit the task by proclaiming that “there is no way to measure how much the [admission of the evidence] influenced the jury’s consideration of the defendant’s guilt.” Dissenting Op. at 1243.
Scenario Three is also the same trial and evidence. Except that counsel, who is present at all times, objects to the admission of the evidence about the fingerprint on the murder weapon because it was obtained in violation of the Fourth Amendment, but the judge erroneously admits the evidence when he should have excluded it. Everyone agrees that the error in admitting evidence seized in violation of the Fourth Amendment is subject to the harmless error rule. See Chambers v. Maroney, 399 U.S. 42, 52-53, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970); see also Whiteley v. Warden, 401 U.S. 560, 569 n.13, 91 S.Ct. 1031, 1037 n.13, 28 L.Ed.2d 306 (1971) (finding Fourth Amendment violation not to have been harmless). The law requires that the district court, and then we as a reviewing court, determine whether the admission of the fingerprint evidence, which is the same *1176 evidence as in the dissent’s hypothetical, was harmless beyond a reasonable doubt. We could not, as the dissent suggests we should, simply quit the task by proclaiming that “there is no way to measure how much the [admission of the evidence] influenced the jury’s consideration of the defendant’s guilt.” See Dissenting Op. at 1243. The Supreme Court did not do that in Chambers or Whiteley.
Scenario Four is, once again, the same trial and evidence. Except the evidence about the fingerprint on the murder weapon is admitted because with the government’s knowledge one of its witnesses gives false testimony that prevents counsel, who is present at all times, from discovering a Fourth Amendment violation that would have caused the court to exclude the evidence. The Supreme Court has held that even such a serious error involving prosecutorial misconduct and corruption of the truth-seeking function of the trial is nonetheless subject to the harmless error rule. See Bagley, 473 U.S. at 678-80, 105 S.Ct. at 3881-82; Agurs, 427 U.S. at 103-04, 96 S.Ct. at 2397. The district court, and then we as a reviewing court, would have to determine whether the admission of the evidence was harmless beyond a reasonable doubt. We could not, as the dissent suggests we should, simply quit the task by proclaiming that “there is no way to measure how much the [admission of the evidence] influenced the jury’s consideration of the defendant’s guilt.” Dissenting Op. at 1243. The Supreme Court did not do that in Bagley and Agurs.
The dissent believes that its fingerprint hypothetical shows “the problem with applying a harmless-error analysis to an absence of counsel during the admission of inculpatory evidence.” Id. at 1243. What the fingerprint hypotheticals actually show is why prejudice should not be presumed. The law is clear that if the hypothetical fingerprint evidence came in because of counsel’s neglect, or because of a Fourth Amendment violation, or because of prose-cutorial misconduct, we would not presume prejudice or automatically reverse the conviction. We would apply the harmless error rule if evidence came in because of a Fourth Amendment violation or because of prosecutorial misconduct, and we would require the defendant to show prejudice if the evidence came in because of trial counsel’s neglect. It would be anomalous to presume prejudice and not inquire into harmlessness if exactly the same fingerprint evidence came in while counsel was briefly outside the courtroom.
5. The Lost Opportunity to Observe Witnesses and Constantly Monitor the Faces of Jurors Argument
The dissent takes the position that if, during the presentation of any inculpatory testimony, defense counsel cannot observe the witness’ demeanor and the jurors’ facial expressions, irremediable error has been committed and reversal is automatic. See Dissenting Op. at 1234, 1236-37. The conviction must be reversed, the dissent insists, even if the testimony is repeated in counsel’s presence because by then “the element of surprise was gone,” M. at 1235, and counsel did not observe the witness’ demeanor and the jurors’ faces “in the first instance.” Id. at 1237.
In support of its proposition that in order to have any hope of rendering effective assistance an attorney must be able to observe a witness’ demeanor throughout his testimony, the dissent cites decisions about the value of factfinders being able to observe witness demeanor (although none of the decisions say that the factfinder must do it continuously). Id. at 1234-35 (citing Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 *1177 L.Ed.2d 518 (1985), Dyer v. MacDougall, 201 F.2d 265, 268-69 (2d Cir. 1952), and United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995)). But defense counsel is not a factfinder. He is an advocate. Unlike jurors, or judges during bench trials, defense counsel is not charged with the responsibility of finding the facts from the testimony presented. Counsel’s role, instead, is to represent his client zealously within the bounds of the law before, during, and after the trial regardless of what he personally believes, or knows, the facts to be.
The dissent presents no decisional authority for its position that in order to render effective assistance trial counsel must watch the faces (and body language?) of jurors as testimony is presented throughout the trial. If the premises of the dissent’s position were accepted, while testimony is being taken counsel should not look at any documents, or at his notes, or turn his head to confer with his client or co-counsel lest he miss an opportunity to search for clues in the facial reactions (including pupil dilation?) of the 12 jurors (plus some alternates). According to the dissent, if counsel fails to observe the facial expressions and body language of all of the jurors as each and every inculpatory answer is given by a prosecution witness, “the element of surprise [is] gone and any initial reactions to the evidence went with it.” Dissenting Op. at 1235. The dissent tells us that all is lost and permanently lost once the jurors’ fleeting facial expressions, or the lack of them, vanish into the mists of time. We will never know what counsel might have done in this case, the dissent conjectures, if only he had been able to divine from the non-verbal cues of each and every juror what they all thought concerning that less than one-half of one percent of the total trial testimony that they first heard while counsel was out.
Which leads to a question. The testimony that the jurors heard while counsel was not there to study their faces included the fact that six of the images found on his client’s computer were of a young female nude and “bound to a table by her feet 'with a rope” and with “an orange cloth ... secured around her neck with silver duct tape.” Is there really any doubt what a reasonable juror’s reaction to the facts contained in that testimony would be? Would any reasonable counsel have to see the jurors’ faces, the first time that testimony comes from the witness box, to know how they felt about it?
And, while we are on the subject, unlike Janus, most lawyers cannot look in two different directions at once. How is a lawyer supposed to keep his eyes trained on the witness giving testimony lest he miss the opportunity to gauge the witness’ credibility, and at the same time never stop watching the faces of a dozen or more men and women in the jury box lest he miss a chance to gauge their reaction to that testimony? Which opportunity should he lose forever? When, if ever, can he look down at his notes, or turn his head to confer with his client or co-counsel? And must we bar attorneys who are blind from representing clients in the courtroom? The dissent does not say.[19]
We conclude that the brief absence of counsel from the courtroom during the *1178 testimony of Deputy Longson was not structural error, prejudice is not to be presumed, and the harmless error rule applies. We turn now to actually applying the harmless error rule to the facts of this case.
VI. Why the Error Was Harmless
In applying the harmless error rule, as we do here, we review the constitutional error to determine whether it was “harmless beyond a reasonable doubt.” Chapman, 386 U.S. at 24, 87 S.Ct. at 828.
A. As to Count 1 (Attempted Child Enticement)
The brief absence of counsel from the courtroom was harmless beyond a reasonable doubt as to Count 1 of Roy’s conviction. See kh We know that it was because the testimony that occurred during counsel’s absence was not about the Count 1 charge of attempted child enticement in violation of 18 U.S.C. § 2422(b). It was, instead, solely about the Count 2-5 charges of knowingly possessing “any visual depiction” of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), (b)(2).
The Count 1 charge is legally distinct from the Count 2-5 charges, having no element in common with them. The charge in Count 1 is also factually distinct from the others because the child pornography that is charged in Counts 2-5 was not even discovered until Roy’s house had been searched after he had already been arrested on the attempted child enticement charge that is in the first count. And the only testimony taken during the seven minutes that counsel was absent was about the Count 2-5 charges of child pornography. No testimony or other evidence about the Count 1 attempted child enticement charge was taken during that time. All of the evidence of Roy’s guilt on Count 1 was presented while defense counsel was present in the courtroom; he missed not one word of it.
Roy argues that the six pornographic images of L.B. that were partially discussed for the first time during his counsel’s brief absence, all of which were part of the evidence of his guilt under Counts 2-5, were also relevant to Count 1. It was relevant, he says, because he asserted an entrapment defense on Count 1, and the government argued in its closing that the images of child pornography discovered on Roy’s various electronic devices showed his proclivity or predisposition for having sex with underage girls. There are two independently adequate reasons why that theory of harm is unconvincing.
The first reason is that those same six pornographic images of L.B. were discussed more and in much greater detail after counsel returned to the courtroom. And those six images were admitted into evidence in counsel’s presence and without objection only after they had been discussed more thoroughly following counsel’s return to the courtroom. Anything that the missed testimony regarding those six images proved was also proven by the lengthier testimony about the same six images that counsel did not miss.
The other independently adequate reason why Roy’s possibility of prejudice through proof of proclivity theory is unconvincing is that those six images of L.B. that were first discussed while counsel was absent were only a fraction of the total number of pornographic still and video images of L.B. and of other underage girls discussed and introduced during the trial. In addition to those six images of L.B., there were at least three other pornographic images of L.B. plus numerous pornographic video files of her, all taken when she was underage, that were found on Roy’s desktop computer. All of those other images of L.B. were the subject of testimony and were introduced into evidence only after Roy’s counsel returned to the court *1179 room, and all of that was done without any objection. Counting the videos, the number of pornographic images of L.B. that were discussed only while counsel was in the courtroom far outnumbered the ones of her discussed while he was out (and again after he returned).
Roy’s desktop computer also contained multiple pornographic images of underage girls other than L.B. All of those pornographic images of other minors were testified about, and admitted into evidence, only while Roy’s counsel was present; none of them was even mentioned during the brief time he was absent. In addition, Deputy Longson also testified in the presence of Roy’s counsel about the dozens of pornographic images, both of L.B. and of other underage girls, that he had found on Roy’s laptop computer and Roy’s USB thumb drive and Roy’s backup CD-ROM discs. Every single piece of that still image and video image evidence of Roy’s crimes was admitted while his counsel was in the courtroom. And it was all admitted without objection. Even without any of the initial testimony about the first six images of L.B. that were mentioned during counsel’s brief absence, the jury was presented with overwhelming and irrefutable evidence of Roy’s sexual interest in minor girls. His proclivity was beyond dispute.
Not only that, but when the AUSA argued against Roy’s entrapment defense at closing, she did not tell the jury to consider only the six images of L.B. on the desktop computer that Deputy Longson had first mentioned while defense counsel was absent. Instead, she asked the jury to consider all of Roy’s images and videos of child pornography, including those Roy had on the three electronic devices that were not discussed at all until counsel returned to the courtroom. She said that Roy’s intent in traveling to the rendezvous with the fictional daughter and mother that led to the Count 1 charge stemmed from his sexual interest in underage girls, which could be seen from the fact that a couple of days before “he’s accessing his [L.B.] folder on the laptop.” (Emphasis added.) The L.B. image folder on the laptop was not mentioned while counsel was out of the courtroom. And the AUSA argued later: “We know he’s viewing child pornography a few days before on his laptop, ladies and gentlemen. He’s got backup CDs of child pornography. He’s got thumb drives of child pornography. He’s got desktops of child pornography.” (Emphasis added.) So the argument referred to child pornography on all four electronic devices specified in Counts 2-5, including that on the three devices (laptop, CD-ROM discs, and thumb drives) that had not been mentioned while counsel was out of the courtroom.
For all of these reasons, the brief absence of Roy’s counsel, during which the Count 1 attempted child enticement charge was not mentioned, was harmless beyond a reasonable doubt as to the conviction on that count.
B. As to Counts 2-5 (Possession of Child Pornography)
For two primary reasons, we know that the error in this case was also harmless beyond a reasonable doubt as to Counts 2-5, the charges of possession of child pornography. First, overwhelming evidence, all of which came in while counsel was present, proved the charges against Roy that were the subject of Deputy Longson’s testimony during counsel’s brief absence. And second, the testimony that Deputy Longson gave during the seven minutes that Roy’s counsel was absent was repeated after he returned to the courtroom.
1. All of the Other Evidence of Child Pornography
The first reason that we know counsel’s seven-minute absence was harmless is that *1180 the testimony he missed concerned only some of the child pornography featuring L.B. and none of the child pornography featuring other minors. Roy could have, and beyond a reasonable doubt would have, been convicted of each of the Count 2-5 possession of child pornography charges even if no image of L.B. had ever been mentioned or indeed had ever even existed. That is because to convict him of the four child pornography possession counts, each of which alleged that he possessed child pornography on a particular electronic storage device, all the prosecution had to show was that he had at least one image of child pornography on each of the four devices. See 18 U.S.C. § 2252(a)(4)(B). It proved much more than that.
The evidence taken while Roy’s counsel was present in the courtroom proved beyond a reasonable doubt that Roy had multiple images and videos of child pornography on each of the four storage devices specified in Counts 2-5. The unrefut-ed evidence proved that, as charged in Count 2, Roy had on his desktop computer five separate pornographic images of minor children other than L.B. that had been downloaded from the Internet.[20] Those five images were more than enough to prove Roy guilty beyond a reasonable doubt of the Count 2 charge. And all of the evidence about those five pornographic images of other minors that were on Roy’s desktop computer came in only while counsel was present in the courtroom.
The evidence that was submitted while counsel was in the courtroom also overwhelmingly proved that Roy possessed child pornography on his laptop computer (separate from his desktop computer), as charged in Count 3. On the laptop, in addition to copies of some or all of the pornographic photos and videos of the underage L.B., there was a folder called “Girls.” It is undisputed that the “Girls” folder contained more than 220 images, all of which were introduced into evidence and at least some of which were child pornography. In particular, Deputy Longson testified about five images of child pornography from that laptop, which were admitted into evidence from the “Girls” folder. Any one of those five images, or any one of the other images of child pornography stored in the “Girls” folder, or any one of the pornographic images or videos of L.B. on Roy’s laptop computer, was enough to prove Roy guilty beyond a reasonable doubt of the Count 3 charge involving that device. And all of the evidence about the child pornography on Roy’s laptop computer (including the evidence about the images of L.B. on it) came in while counsel was present in the courtroom.
Count 4 charged Roy with possessing at least one depiction of child pornography on a USB thumb drive. Along with copies of the pornographic images and videos of the underage L.B., there were five images of child pornography featuring minors other than L.B. that were admitted into evidence from Roy’s USB thumb drive. Those five images alone were more than enough to prove Roy guilty beyond a reasonable doubt of the Count 4 charge. And every bit of that evidence about the child pornography stored on Roy’s thumb drive came in while counsel was present in the courtroom.
*1181 As to Count 5, Deputy Longson testified that the three CD-ROM discs that were the subject of that charge “absolutely” contained child pornography, including duplicate or backup copies of the L.B. videos and images along with pornographic “images of ... minors that are not” L.B. that were also on the laptop and desktop computers. Doc. 141 at 154, 165. Those images of child pornography were more than enough to prove Roy guilty beyond a reasonable doubt of the Count 5 charges. And every bit of that evidence about the child pornography on Roy’s compact discs came in while counsel was present in the courtroom.
Roy’s counsel was in the courtroom for the presentation of all of that evidence proving Roy’s guilt of the Count 2-5 charges. He objected to none of it. His sole comment during that testimony was to ask whether he could review Government’s Exhibit 76, a 110-page compilation of the images from the “Girls” folder, before it was admitted into evidence. Id. at 145. Beyond a reasonable doubt, Roy’s counsel’s absence during seven minutes in which none of the evidence we have recounted in this section was submitted did not harm him on the Count 2-5 charges. It could not have.
2. The Repetition of the Missed Testimony After Counsel Returned
The second, equally compelling reason that counsel’s absence was harmless beyond a reasonable doubt on the Count 2-5 charges is that the facts covered in the testimony that Deputy Longson gave while Roy’s counsel was out of the courtroom were covered again soon after Roy’s counsel returned.
Longson testified in counsel’s absence about a folder called “2006-03-11” he had found on Roy’s desktop computer. The folder was made by a user of the computer and contained six pornographic images. See Doc. 141 at 106-07. He testified that the photographic images had been taken with a “Kodak v530 zoom digital camera” and that they showed a “nude white female who was bound to a table by her feet with rope,” with her “head covered with an orange cloth which was secured around her neck with silver duct tape.” Id He also testified that he had brought to court a disc containing videos of child pornography he found on Roy’s computer and that he had made some screenshot images from those videos. Id. at 107-08.
Then, after Roy’s counsel returned to the courtroom, Longson repeated the testimony that he had given in counsel’s absence. He testified about those same images again after counsel returned, and only then were they admitted into evidence. See id. at 108 (images “were located and recovered from the desktop computer”); id at 109-10 (folder was stored under “user profile Alex”); id. at 110 (images were located in a “file” named “2006-03-11” and showed a “white female who is bound to a table by her feet with a ... rope” and wearing “an orange hood across her head with silver duct tape secured around the neck”); id at 131 (the camera that made the still images was a “Kodak v530 zoom digital camera”); kL at 119-21 (discussing the pornographic videos of the then-underage L.B. found on Roy’s computer, and the still images Longson made from them).
Roy’s counsel did not object to the admission of any of those images of child pornography. Nor did he object to any of the testimony describing their discovery, their location, or their provenance. With a single exception discussed below, every bit of inculpatory testimony that had been given during counsel’s brief absence was repeated, and. a lot more was added, after counsel returned. We know that Roy was not prejudiced by counsel’s absence be *1182 cause the same evidence would have come in even if those 18 questions and answers had never occurred in his absence — and it did come in after he returned. We know counsel would not have made any objections to any of that testimony or evidence if he had been present during the seven minutes immediately after the lunch break because he did not object to the same testimony and evidence when it was repeated soon after he returned to the courtroom.[21]
To be sure, as we have mentioned, there is one immaterial difference between Longson’s testimony while Roy’s counsel was absent and his testimony after Roy’s counsel came back. See supra at 1137 n.l. While testifying during counsel’s absence, Longson correctly identified the date on the “2006-03-11” folder but incorrectly stated that the images in that folder were created “on March the 10th, 2005, at 6:49 p.m.” Doc. 141 at 107. He repeated that assertion two answers later, reiterating that those images were “created initially by the camera” on “March the 10th of 2005 at 6:49 p.m.” Id. After Roy’s counsel returned, Longson correctly testified that the images had been created on March 11, 2006, which is what the date on the folder showed. See id. at 110-11.
Longson’s mistake during counsel’s absence did not prejudice Roy. It was immaterial because there was no dispute that L.B. was born on May 9, 1989. That means she was under the age of 18, and therefore a minor, on March 11, 2006 (when she was 16 years old) just as she was on March 10, 2005 (when she was 15 years old). See 18 U.S.C. § 2252(a)(4)(B) (prohibiting knowing possession of visual depictions of a “minor engaging in sexually explicit conduct”); id. § 2256(1) (defining “minor” as “any person under the age of eighteen years”). A defendant who possesses child pornography is just as guilty of the crime if the child is 16 years old as he is if the child is 15 years old. The defining line for the crime is the 18th birthday. And, in any event, the immaterial error was corrected in Longson’s later testimony.[22]
There is one other point to be made about the harmlessness of counsel’s absence when Deputy Longson stated that L.B. was 15 when the pornographic images of her in the “2006-03-11” folder were tak *1183 en. The jury not only would have convicted Roy regardless of whether it believed L.B. was 16 or 15 when those particular pornographic images of her were taken, it also could and would have convicted Roy even if it believed L.B. had been 18 or 80 when the images were taken. If none of the images of L.B. existed, or even if L.B. herself never existed, Roy’s guilt of the Count 2-5 charges would still have been proven by all of the child pornography depicting children other than L.B. that was found on his desktop computer, on his laptop computer, on his thumb drive, and on his three backup CD-ROM discs. See supra Section VLB.l.
C. The Problem Juror
In an attempt to get out from under the piles of evidence against him, Roy argues that the jury’s inability to reach a verdict soon after deliberations began establishes that the jury “did not find the evidence overwhelming,” and “may have questioned” the government’s case. Not really.
Here is what the record shows. The jury retired to deliberate at 12:43 p.m. on Thursday, June 14, 2012. At 6:30 p.m. that evening, the jury reported that it was unable to reach a verdict. Roy’s counsel suggested an Allen charge. See Allen v. United States, 164 U.S. 492, 501-02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). After further discussion, though, and without an Allen charge being given, the jury foreman reported that they would “like to recess for the night and try again in the morning.” The court then gave the Allen charge anyway and let the jurors go home for the night without further deliberations.
The problem the jury was having surfaced the next morning before deliberations resumed. One of the jurors went to the courthouse early, sought out a clerk, and complained about how the deliberations had been going. In the presence of counsel for both sides, the judge questioned the juror. When the judge asked him if he wished to continue to deliberate, the juror said that given the way “the verdict is being deliberate [sic] in the jury room, no sir.” When the judge asked again, the juror stated: “Sir, I want to continue, but the way that it’s — the vulgar way that-it’s being done, foul way, whatever word you can use, that they are — that is being used in the jury room to come to a verdict is — I think borders on against the law.” When the judge explained to the juror that the choice was for him to either rejoin the jury or the judge could remove him if he was unable to continue, the juror said he wanted to consult with a lawyer. He explained that he wanted a lawyer “to speak to, to see what rights I have as an American citizen,” and “I need to know what my legal rights are when things happen within that jury box -that’s only known to the jurors but borders on a violation of the laws.”
After discussing it, the AUSA and Roy’s counsel agreed that they wanted the problematic juror dismissed and both stated that they preferred to proceed with the remaining 11 jurors instead of calling in the alternate juror and restarting deliberations. Roy himself agreed to proceed with 11 jurors. The complaining juror was removed from the jury, which resumed deliberations. Only 37 minutes after the jury resumed deliberations that morning, it reached a verdict convicting Roy of all five counts charged in the indictment.
This is not, as Roy asserts, the picture of a “deadlocked jury” wrestling with the evidence. It is, instead, the picture of one juror who was disrupting the deliberations and whose statements and actions were troubling enough for both sides to agree that he needed to be removed so that the jury could deliberate to a verdict. Which is what the jury did soon after the problem juror was removed.
*1184 D. The Theory that the Jury Violated Its Oath and Disobeyed Its Instructions
Unable to point to any realistic possibility of prejudice from trial counsel’s brief absence, the dissent proffers an unsubstantiated hunch that the reason the jury convicted Roy of the crimes he committed is not because of all the unrefuted evidence against him on each and every count, even though that massive amount of unrefuted evidence would have convinced any reasonable jury of his guilt beyond any doubt. Instead, the dissent’s alternate world view is that the jury may have convicted Roy only because it noticed that his counsel was a few minutes late getting back to the courtroom after one break during one of the six days of trial and unreasonably held that against Roy. Or, posits the dissent, the jury may have thought that the judge noticed counsel’s absence (even though there is nothing in the record to indicate that he did) and unreasonably held against Roy the judge’s failure to intervene on his behalf. See Dissenting Op. at 1235-37.
There is nothing to indicate that the jury noticed the absence of Roy’s counsel. More fundamentally, there is no basis whatever for assuming that if the jury had noticed, it would have held counsel’s one momentary absence against Roy, treating it as evidence of his guilt. The dissent implies that, if the jury noticed that defense counsel was absent, it may have concluded that counsel thought Roy was so guilty there was no point in him being in the courtroom, or perhaps it somehow may have done “irreparable damage to the jury’s perspective of defense counsel.” Id. at 1236. The answer to that conjecture run wild is that there is no reason at all to think any reasonable juror would draw any adverse inferences, and there are plenty of reasons to believe that a reasonable juror would not.
To begin with, the jury saw that counsel vigorously defended Roy during 99.6 percent of the trial, missing only seven minutes because he was late returning to the courtroom on one of the many breaks that occurred during the six day trial. The jury knew that defense counsel believed in his role as Roy’s advocate because it saw and heard him tenaciously defend Roy in his opening statement, throughout the trial, and in his closing argument. The jury saw and heard counsel cross-examine nine government witnesses, including the one who was on the stand when he returned to the courtroom;' counsel cross-examined that witness for 45 pages of the transcript. The jury saw and heard counsel call his own competing expert witness to testify on Roy’s behalf. It saw and heard counsel object to questions asked by the prosecutor and make a vigorous closing argument. Throughout the trial, the jury saw and heard counsel, in Cronic terms, “subject the prosecution’s case to meaningful adversarial testing,” Cronic, 466 U.S. at 659, 104 S.Ct. at 2047. The jury could not reasonably have concluded that defense counsel did not believe in what he was doing as Roy’s advocate.
The same is true of the dissent’s conjecture that the jury or jurors may have noticed that the judge was aware of counsel’s brief absence and somehow inferred from the judge’s inaction that he thought Roy was guilty. Dissenting Op. at 1237. There is not one whit of support for that theory in the record. There is nothing to indicate that the judge knew counsel was absent during those seven minutes, nor is there anything to indicate that, if he did, the jury somehow was aware that he did. In fact, the record shows that the jury had good reason to believe the judge did not notice counsel’s absence when court resumed. This is what the judge had instructed the jury when court recessed at the end of the first day of trial:
*1185 We will get started Monday at 9:00 o’clock. So if you are unfamiliar with coming into the Fort Pierce area that time of day, I ask that you give yourself a few extra moments and get here before 9:00 o’clock, 8:45, 8:50 or so, so we can get started on time. If we are missing just one of us, you, me, the lawyers, we can’t get started. So in order to keep the case on track time-wise and [as a] courtesy to your fellow jurors, I would ask that you be here sometime before 9:00 o’clock so we can get started promptly at 9:00.
(Emphasis added.) Having been told by the judge on the first day that he would not resume trial following a recess without the lawyers being present, the only reasonable inference the jury could have drawn from the judge resuming the trial without one of the attorneys being present following the lunch break on the second day is that the judge did not realize the attorney wasn’t there.
Nor is there any reason to believe, as the dissent conjectures, that if the judge did notice counsel’s absence, and if the jury somehow knew he noticed it, the jury would infer from the judge’s failure to act that he must have thought Roy was guilty. If one is engaging in conjecture, it is just as likely the jury could have inferred that the judge did not think that particular testimony required counsel’s presence, or if it were required, the judge thought that the testimony could be repeated in counsel’s presence, which is exactly what happened immediately after counsel walked into the courtroom.
All of those reasons are enough to dispose of the dissent’s unsupported theory of an illogical jury. But there is more reason to reject it. The standard oath taken by every juror before a federal trial begins requires that the juror swear or solemnly affirm that he or she “will well and truly try, and a true deliverance make in, the case now on trial, and render a true verdict according to the law and the evidence, so help you God” (emphasis added).[23] The dissent’s position is that instead of believing that the jurors adhered to their solemn oath to render their verdict “according to the law and the evidence,” ample though the evidence was, we should instead indulge the baseless assumption that the jurors disobeyed their oath and convicted Roy because of what they may have imagined defense counsel or the judge thought, assuming that' the jurors noticed what there is nothing in the record to indicate that they noticed.
And then there are the instructions the jury was given. After the jury was sworn but before the trial began, the judge gave opening instructions that, among other things, charged the jury that:
It will be your duty to find from the evidence what the facts are. Yoü and you alone are the judges of the facts. You will then have to apply to those facts as the law, as the Court will give it to you, and you must follow that law whether you will agree with it or not.
Nothing the Court may say or do during the course of the trial is intended to indicate nor should be taken by you as an indication of what your verdict should be.
*1186 At another place in those opening instructions, the judge reminded the jury that: “You are to decide the case solely on the evidence presented here in the courtroom.”
After all of the evidence was in, the court gave the jury closing instructions. Near the beginning of those instructions, the court charged the jury that “Your decision must be based only on the evidence presented here.” Later, the court expounded on that:
As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and isn’t binding on you. And you shouldn’t assume from anything that I’ve said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts. Your own recollection and interpretation of the evidence is what matters.
The court also went into detail explaining to the jury how it should go about considering the evidence and deciding what weight to give particular evidence and which witnesses to believe. The court instructed the jury on the elements of the crimes and charged it that the defendant could be found guilty only if those elements were proven beyond a reasonable doubt. The instructions could not have been clearer that: “The Government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the Defendant not guilty.”
It is impossible to reconcile the dissent’s theory that the jury may have based its verdict on something other than the evidence admitted at trial and the law that the judge instructed it on with the specific and detailed instructions that the jury was given. The theory works only if we assume the jurors violated their oaths, disobeyed their instructions, and acted in a lawless fashion. The law is that we cannot assume that and must instead assume exactly the contrary.
More than 30 years ago the Supreme Court explained that
the crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed.
Marshall v. Lonberger, 459 U.S. 422, 438 n.6, 103 S.Ct. 843, 853 n.6, 74 L.Ed.2d 646 (1983) (quotation marks omitted). For that reason, the Supreme Court has repeatedly held that we must presume that juries follow their instructions. See, e.g., Kansas v. Carr, 577 U.S. ——, 136 S.Ct. 633, 645, 193 L.Ed.2d 535 (2016) (“We presume the jury followed these instructions....”); Evans v. Michigan, 568 U.S. 313, 133 S.Ct. 1069, 1080, 185 L.Ed.2d 124 (2013) (“[A] jury is presumed to follow its instructions.”); Blueford v. Arkansas, 566 U.S. 599, 132 S.Ct. 2044, 2051, 182 L.Ed.2d 937 (2012) (same); Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L.Ed.2d 727 (2000) (same); Zafiro v. United States, 506 U.S. 534, 540, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993) (“[J]uries are presumed to follow their instructions.”); CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841, 129 S.Ct. 2139, 2141, 173 L.Ed.2d 1184 (2009) (“[A]s in all cases, juries are presumed to follow the court’s instructions.”); United States v. Olano, 507 U.S. 725, 740, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508 (1993) (“[We] presum[e] that jurors, conscious of the gravity of their task, attend *1187 closely the particular language of the trial court’s instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.”); Richardson v. Marsh, 481 U.S. 200, 206-07, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987) (“This accords with the almost invariable assumption of the law that jurors follow their instructions, which we have applied in many varying contexts.”) (citation omitted); Tennessee v. Street, 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985) (stating that “the question is reduced to whether, in light of the competing values at stake, we may rely on the crucial assumption that the jurors followed the instructions given them by the trial judge,” and answering that question in the affirmative) (quotation marks omitted); Francis v. Franklin, 471 U.S. 307, 324 n.9, 105 S.Ct. 1965, 1976 n.9, 85 L.Ed.2d 344 (1985) (recognizing “the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions”).
We have obediently followed and repeated the Supreme Court’s direction that we presume juries follow their instructions. United States v. Lopez, 649 F.3d 1222, 1237 (11th Cir. 2011) (“We presume that juries follow the instructions given to them.”); United States v. Siegelman, 640 F.3d 1159, 1184 (11th Cir. 2011) (same); United States v. Townsend, 630 F.3d 1003, 1013-14 (11th Cir. 2011) (same); United States v. Almanzar, 634 F.3d 1214, 1223 (11th Cir. 2011) (same).
Despite the overwhelming evidence of Roy’s guilt, the dissent questions whether the jury may have found him guilty because of inferences about counsel’s brief absence or the court not stopping the proceedings if it noticed counsel’s absence. See Dissenting Op. at 1235-37. Those are the wrong questions. The right question, as all of the cited decisions of the Supreme Court and this Court establish, is this one: What was the jury instructed to base its verdict on? That is the right question because “[t]he presumption that juries follow their instructions is necessary to any meaningful search for the reason behind a jury verdict.” United States v. Brown, 983 F.2d 201, 203 (11th Cir. 1993).
The jury was instructed to base its verdict on the law contained in the instructions the judge gave it and the evidence in the form of testimony and exhibits admitted during the trial. It was instructed that what the lawyers said and what the judge said or did was not evidence, and that it was to decide the facts solely on the basis of the evidence presented in the courtroom. The jury was also instructed that it could not and should not convict Roy unless the prosecution had carried its burden of proving his guilt beyond a reasonable doubt. We can, should, and must presume that the jury followed those instructions and convicted Roy solely because his guilt was proven beyond a reasonable doubt by the evidence.[24]
The dissent’s contrary theory also violates the principles the Supreme Court instructed us about when it discussed how courts should go about determining whether an error resulted in prejudice sufficient to justify setting aside a judgment:
*1188 In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, “nullification,” and the like. A defendant has no entitlement to the luck of a lawless decision-maker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.
Strickland, 466 U.S. at 694-95, 104 S.Ct. at 2068 (emphasis added); see also Brady v. Maryland, 373 U.S. 83, 90-91, 83 S.Ct. 1194, 1198, 10 L.Ed.2d 215 (1963) (rejecting “[a] sporting theory of justice” that assumes the jury might have violated the judge’s ruling and instructions). Following the Supreme Court’s instructions to us, we must assume that the jury followed its instructions and oath.
E. Summary
The harmlessness analysis in this case is not difficult. The error that occurred when the trial resumed before counsel returned from lunch was harmless beyond a reasonable doubt because overwhelming evidence offered while counsel was present went to and proved the charges in Counts 2-5, which were the only counts relevant to the testimony given during counsel’s absence. And the same questions were repeated and not objected-to after counsel returned to the courtroom. There is no reasonable doubt that counsel’s brief absence was harmless.
VII. Conclusion
We end, as we began, by acknowledging that although Alexander Roy received a fair trial he did not receive a perfect one. Whatever the circumstances surrounding it, and regardless of who knew what and when they knew it, we do not condone the taking of any inculpatory testimony in the absence of defense counsel. It is constitutional error, which should be avoided. But neither would we condone, much less participate in, scuttling the harmless error rule. As we have explained, the rule plays an important role in, and serves vital interests of, our judicial system. To reverse Roy’s conviction based on his counsel’s brief absence during initial presentation of only a small part of the overwhelming evidence against his client would require us to enlarge exceptions to the harmless error rule to the point where they would be large enough to consume much of the rule. Doing that would run counter to decisions of the Supreme Court, this Court, and the better reasoned decisions of other circuits.
The dissent expresses the view that “we must vigilantly ensure we are adhering to our obligation” and “commitment to the Constitution” where the defendant has committed “disturbing” crimes. Dissenting Op. at 1245. And it espouses the view that the more disturbing the crimes the defendant committed the greater our obligation to adhere to the law because “the constitutional processes that the Framers put into place are there to protect everyone, including people accused of the gravest and most serious crimes.” Id. We disagree with any suggestion, if it be such, that someone charged with sexual crimes against minors is entitled to more constitutional protections than someone charged with kiting checks. The constitutional protections are the same for all regardless of their crimes.
We do agree, of course, that “[t]he Sixth Amendment guarantee of the right to counsel does not apply on a sliding scale based on the gravity of the defendant’s offense.” Id. at 1245. But neither does the *1189 application of the harmless error rule vary inversely with the seriousness of the crime. Countless other convicted defendants whose trials were less than perfect have been denied automatic reversal and a presumption of prejudice. This defendant, although he is entitled to the full protections of the law, is not entitled to special treatment. Because the Sixth Amendment violation that occurred during his trial was harmless beyond a reasonable doubt, his conviction is due to be affirmed.
The judgment of the district court is AFFIRMED.

. There is only one difference. In his testimony while defense counsel was absent, Longson said that the photographic images of the young female were taken on March 10, 2005; in his testimony after counsel returned, he said that they were taken on March 11, 2006. Regardless of whether the photographic images were taken in March 2005 (when L.B. would have been 15 years old) or March 2006 (when L.B. would have been 16 years old), she was a minor at the time. She did not turn 18 until May 9, 2007. See infra at 1136-37.

. In one place the transcript identifies this folder as "2006-02-04,” but the immediately following question on that same page ("So December 4th, 2006?”) and the other references to the folder name indicate that this was a transcription error and the folder was actually called "2006-12-04.” For that reason, we are referring to it that way in this opinion. The difference, in any event, is immaterial.

. Exhibits 73-01 through 73-06 are the pornographic still images of L.B. from the "2006-03-11” folder that was found on Roy's desktop computer. Exhibits 73-07 through 73-09 are the still pornographic images of L.B. that were found in the "2006-12-04” folder on Roy’s desktop computer. And Exhibit 73-10 is the “contact sheet” showing several still images from the pornographic video of L.B. in that same folder.

. If we were required to decide whether the judge realized that defense counsel was not present when he resumed the trial after the lunch break, we would take into account the fact that the judge had previously stated he would not start court after a recess without *1141 the lawyers being present. This is what the judge had told the jury before the recess at the end of the first day of trial:
We will get started Monday at 9:00 o'clock. So if you are unfamiliar with coming into the Fort Pierce area that time of day, I ask that you give yourself a few extra moments and get here before 9:00 o’clock, 8:45, 8:50 or so, so we can get started on time. If we are missing just one of us, you, me, the lawyers, we can’t get started. So in order to keep the case on track time-wise and [as a] courtesy to your fellow jurors, I would ask that you be here sometime before 9:00 o'clock so we can get started promptly at 9:00.
(Emphasis added.)

. The following exchange during oral argument between a judge of this Court and Roy’s appellate counsel conveys Roy's position on the remand question:
Marcus, J.: .... I want to follow up on Judge Wilson’s question. He asked you whether a remand is necessary if there’s a Cronic violation. Your answer was no, because the record is complete.
Mr. Rashkind: Correct.
Marcus, J.: Let me ask the converse question. It would be equally true that a remand would be unnecessary even if harmless error applied, right?
Mr. Rashkind: I think that's probably true. Yes, sir.
Marcus, J.: Okay. So there’s no reason for a remand no matter how we come at the question.
Mr. Rashkind: I don’t — I think you’re right. The government’s position was essentially the same.

. The lead dissent has difficulty confining itself to the facts in the record, as the parties agree that we should. It almost does, but just five sentences from the end of its opinion, the dissent says: “When a district court allows substantive, inculpatory evidence against a criminal defendant in the absence of any counsel and in the presence of the jury....” Dissenting Op. at 1248. The problem with “allows” is that it implies the district court noticed defense counsel was absent and went on. There is nothing in the record to indicate that the district court did that. Instead, as we have pointed out, the indication is that the court did not notice counsel was absent, although we make no assumption either way. See supra n.4.

. This case does not involve one of those more common Sixth Amendment claims alleging that counsel's performance was outside the wide range of reasonable professional assistance and that it prejudiced the defendant, with prejudice being defined as a reasonable probability of a different result but for counsel's deficient performance. See Strickland v. Washington, 466 U.S. 668, 689-90, 694-95, 104 S.Ct. 2052, 2065-66, 2068, 80 L.Ed.2d 674 (1984). That type of attorney error issue is the stuff of Strickland v. Washington and the tens of thousands of decisions that have cited, discussed, and applied that progenitor of modern ineffective assistance law. Given the limited knowledge we have about the circumstances involving the absence of Roy's counsel and what, if anything, he realized when he returned to the courtroom, and given the assumptions we have made, see supra Part IV, we are not treating this as an attorney error case. See Vines v. United States, 28 F.3d 1123, 1127 (11th Cir. 1994) (“Strickland assumes the presence of counsel and is therefore inapplicable in the absence of counsel context.”). Nor do the parties treat it as one.

. There are three dissenting opinions. All of our references to “the dissent” and "the dissenting opinion” are to the principal dissent-tag opinion, which was authored by Judge Wilson and joined by Judge Martin.

. En Banc Br. of Appellant at 23 ("The quoted direct examination of the government expert occurred during defense counsel's absence. It involved the admission of inculpa-tory and disputed evidence. It was, therefore, a critical stage of trial.”).

. In its Gonzalez-Lopez opinion the Court cited Cronic only once, actually relying on Cronic as support for the proposition that a defendant is usually required to show prejudice. See Gonzalez-Lopez, 548 U.S. at 146, 126 S.Ct. at 2562 ("The cases the Government relies on involve the right to the effective assistance of counsel, the violation of which generally requires a defendant to establish prejudice. See, e.g., Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Mickens v. Taylor, 535 *1150 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002); United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).”) (citation reformatted).

. How distinguishable Gonzalez-Lopez is from this case and others involving brief absences of counsel from the courtroom is evident from the dissent’s inability to point to any decision of any court anywhere suggesting that 'the holding of Gonzalez-Lopez or anything the Supreme Court said in that case is applicable to momentary absence of counsel situations.

. There is some ambiguity in the Green opinion about the actual length of defense counsel’s absence, but portions of the transcript that are quoted in that opinion indicate that he was gone for at least an hour and forty minutes of the trial. See Green, 809 F.2d at 1260 (noting that defense counsel for Green's codefendants had begun cross-examining a witness at 2:00 p.m. and by 3:40 p.m. the defendant’s trial counsel still had not returned to the courtroom).
Not only that, but Green’s counsel may have also missed other portions of the criminal proceedings against her, including an entire hearing on a suppression motion, the government’s closing arguments at trial, and the jury asking the judge questions that had come up during its deliberations. See id. at 1259 n.l.
The Green court did suggest that ”[t]he absence of counsel during the taking of evidence on the defendant’s guilt is prejudicial per se" and forecloses any inquiry into harmless error. IcL at 1263. However, the court undercut that apparently categorical statement when it noted that "some absences by a criminal defendant’s attorney might be so de minimis that there would be no constitutional significance." Id at 1261. In any event, the actual holding of the Green decision cannot be that any absence of counsel during any inculpatory testimony requires a presumption of prejudice because those were not the facts of that case, and the holding of a case cannot extend past its facts, as we have repeatedly held. See, e.g., Anders, 346 F.3d at 1031; Watts, 316 F.3d at 1207; Aguillard, 217 F.3d at 1321. If the holding of Green were that the absence of counsel during the taking of any evidence of a defendant’s guilt is “prejudicial per se,” we would disagree for the reasons explained throughout this opinion.

. Many state appellate courts have also concluded that the harmless error rule applies to the temporary absence of defense counsel from the courtroom. See Jackson v. State, 983 So.2d 562, 574-77 (Fla. 2008) (applying harmless error analysis to trial court’s decision to hear testimony from the victim for purposes of sentencing the defendant while defense counsel was absent); Hodges v. State, 116 S.W.3d 289, 292-94 (Tex. Ct. App. 2003) (applying harmless error analysis to defense counsel’s absence during presentation of adverse testimony from a detective during the penalty phase of a case); Wilson v. State, 764 So.2d 813, 815-19 (Fla. 4th DCA 2000) (applying harmless error analysis to defense counsel’s absence during jury deliberations and proceedings involving a question from the jury); State v. Scherzer, 301 N.J.Super. 363, 694 A.2d 196, 237-40 (1997) (applying harmless error analysis where defense counsel was absent "from many pretrial proceedings; a portion of jury voir dire; several days of testimony during trial, including the entire testimony of the State’s expert witness ...; parts of [the] codefendants’ and the prosecutor’s summations; a portion of the charge conference; some of the jury’s questions during deliberations; and also the reading of the jury’s verdict”). In the Hodges decision, the Texas Court of Appeals stated that it agreed with our decision in Vines that a temporary absence of counsel during part of the trial does not necessarily infect the entire trial and preclude application of the harmless error doctrine. Hodges, 116 S.W.3d at 294 n.7.

. As we explain later, the dissent’s argument that the structural error inquiry varies depending on whether the absence of counsel occurs in a single-defendant or multi-defen-dant trial is also inconsistent with its argument that the absence of counsel is structural error because counsel must continually scrutinize the faces and body language of witnesses and jurors. See infra n. 19.

. The dissenting opinion insists that the substantial portion standard turns on a "rigid comparison” and "mechanical focus,” one that looks only at the "minutes and seconds” that defense counsel was consciously or physically absent from the courtroom. See Dissenting Op. at 1241-42. Of course the amount of time counsel was out is relevant. Would the dissent rigidly and mechanically have us ignore the length of time and treat one minute's absence the same as one day's absence? Would it have us treat a few questions missed as equivalent to a few volumes of testimony? Apparently the dissent would, because its position is that even a single inculpatory answer in itself constitutes a critical stage and structural error' — that there are hundreds or even thousands of separate critical stages in every trial. We would be the first circuit in the country to adopt such an extreme position.
We disagree with the dissent's position and agree with the five other circuits that have adopted the substantial portion standard (counting the Second Circuit which has adopted a materially identical standard). In doing so we recognize that the standard involves a case-by-case inquiry and consideration of a number of non-exclusive factors. It is neither rigid nor mechanical.

. The dissent does not face up to this important point, insisting that we are concluding “that directly inculpatory evidence introduced against a defendant in a single-defendant, single-counsel case while defense counsel is absent constitutes harmless trial error.” See Dissenting Op. at 1240 (emphasis omitted). That is not the issue and it is not what we are holding. What we are holding is that the constitutional violation, like virtually all constitutional violations, is subject to analysis under the harmless error rule. It will lead to reversal unless the government carries its burden of proving that, when measured in light of all the evidence in the case, the violation was harmless beyond a reasonable doubt.

. In support of its position the dissent cites White v. Maryland, 373 U.S. 59] 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963). That case involved the introduction at trial of the guilty plea that the defendant had entered during a preliminary hearing without representation of counsel. Id. at 59-60, 83 S.Ct. at 1051. The Supreme Court held that a preliminary hearing where a defendant pleads guilty is a critical stage of a trial. Id. Roy was not completely denied counsel throughout a critical stage of the trial, such as a preliminary hearing, and he did not enter a guilty plea while he was without counsel. Entry of a guilty plea by the defendant is not equivalent to the absence of an objection to testimony. Cf. Florida v. Nixon, 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004) ("A guilty plea ... is an event of signal significance in a criminal proceeding.”) (citation omitted).

. Actually, as the dissenting opinion in Bag-ley points out, those "two principal witnesses” were the only witnesses against the defendant on the charges for which he was convicted. 473 U.S. at 685, 105 S.Ct. at 3385 (Marshall, J., joined by Brennan, J., dissenting); see also Bagley v. Lumpkin, 798 F.2d 1297, 1299 (9th Cir. 1986) ("At trial [those two witnesses] provided the only testimony on the controlled substance charges.”); Bagley, 473 U.S. at 671, 105 S.Ct. at 3377 (noting that the controlled substances charges were the only ones on which the defendant was convicted). And there was no evidence to corroborate the testimony of those two witnesses. Lumpkin, 798 F.2d at 1299 n.1.

. It is interesting to note that the dissent’s position that to have any hope of rendering effective assistance counsel must constantly scrutinize the faces and body language of witnesses and all of the jurors is inconsistent with the dissent’s position that counsel absences during multiple defendant trials may be okay because the attorney for a co-defendant can fill in for a defendant’s own counsel. A counsel who is out of the courtroom cannot see the faces or body language of witnesses or jurors regardless of what some other attorney who is in the courtroom is doing.

. Roy also had three other still images and several videos taken of L.B., which were child pornography, stored on his desktop computer, but it is at least arguable that those images were first mentioned while Roy’s counsel was absent. We will assume as much and disregard the other images of L.B. on the desktop, because even if we don’t count them, the pornographic images of other children on the desktop proved that Roy was guilty of the Count 2 charge.

. Roy suggests that if counsel had been present to hear the 18 questions he missed, he could have objected to some of the questions as leading. That theory of prejudice utterly fails for two reasons. First, any competent lawyer can rephrase leading questions, and the transcript of the trial leaves no doubt that the AUSA in this case was competent. It also shows that on at least a dozen occasions during the trial when an objection for leading was sustained, the AUSA rephrased questions and succeeded in getting the testimony she wanted into evidence.
Second, when many of the same questions were asked in defense counsel's presence after he returned to the courtroom, they too were leading but counsel did not object. Roy cannot explain why his counsel did not object to the leading nature of questions asked after he returned to the courtroom but would have objected if he had been present when the same questions were asked in the same fashion earlier.

. About Longson's mistake in his initial testimony concerning the date those particular images were created, the dissent argues that "[t]he significance of such an error is particularly obvious” because Roy did not have any contact with L.B. until August of 2005, which was after the date that Longson mistakenly stated in his initial testimony. See Dissenting Op. at 1235. All that fact makes “particularly obvious” is that the March 10, 2005 date that Longson initially stated was mistaken, which is something no one disputes. But neither does anyone dispute that if March 11, 2006 is the correct date, which the physical evidence and Longson’s later testimony . prove, Roy committed the crime with which he is charged because L.B. was still a minor on that date and the images of her are pornographic.

. The Benchbook for United States District Court Judges states the oath as follows:
"Do each of you solemnly swear [or affirm] that you will well and truly try, and a true deliverance make in, the case now on trial, and render a true verdict according to the law and the evidence, so help you God?” Federal Judicial Center, Benchbook for U.S. District Court Judges 269 (6th ed. 2013), available at http://www.fic.gov/public/pdf.nsf4ookup/ Benchbook-US-District-Judges-6TH-FJC-MAR-2013-Public.pdh$file/Benchbook-US-District-Judges-6TH-FJC-MAR-2013-Public. pdf.

. In one case where defense counsel slept "frequently ... almost every day ... morning and evening for 30 minutes at least at a time” throughout the entire 15-day trial, the jurors discussed during deliberations their observations of the attorney "resting his head.” Ragin, 820 F.3d at 613, 621-22. (internal marks and brackets omitted). But it was never clarified whether any juror had held counsel's dozing off against the defendant. Id. at 621 n.6. In any event, even if a juror did do so in the Ragin case, that would not justify assuming that the jurors in this case violated their oath and the instructions they were duty bound to follow.